# NORTH CHICAGO ROLLING MILL COMPANY *v.* ST. LOUIS ORE AND STEEL COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 197. Argued January 11, 1894. — Decided April 9, 1894.

A garnishee, who occupies the double position of debtor to the principal defendant in a definite or ascertained amount, and also that of a creditor of such principal debtor by way of unliquidated damages arising out of the breach of a contract in existence when the garnishment proceedings were instituted, can, after an order at law subjecting the defined indebtedness to the payment of the garnishor, invoke the aid of a court of equity to restrain the garnisheeing creditor from enforcing the payment of the amount due until the unliquidated damages can be ascertained, and set off against such indebtedness, on the ground that the principal debtor is insolvent and a non-resident of the State in which the garnishee resides, and in which the garnishment proceedings are had.

Equity will entertain jurisdiction and afford relief against the collection of

a judgment where there is a meritorious, equitable defence thereto, which could not have been set up at law, or which the party was, without fault or negligence, prevented from interposing.

The adjustment of demands by counter-claim or set-off rather than by independent suit is favored and encouraged by the law, to avoid circuity of action and injustice.

The insolvency of the party against whom a set-off is claimed is a sufficient ground for equitable interference; and in Illinois and some other States the non-residence of the party against whom the set-off is asserted, is also held to be sufficient ground therefor.

It is settled in England, where the law differs in no material respect from that of Illinois, that a garnishee order does not effect a transfer of the debt to the garnishor, or create the relation of creditor and debtor between him and the garnishee.

It is a recognized principle that the rights of the garnishor do not rise above or extend beyond those of his debtor; that the garnishee shall not, by operation of the proceedings against him, be placed in any worse condition than he would have been in had the principal debtor's claim been enforced against him directly; that the liability, legal and equitable, of the garnishee to the principal debtor is a measure of his liability to the attaching creditor, who takes the shoes of the principal debtor and can assert only the rights of the latter.

THE court stated the case as follows:

The principal question presented by the record in this case is whether a garnishee, who occupies the double position of debtor to the principal defendant in a definite or ascertained amount, and also that of a creditor of such principal debtor by way of unliquidated damages arising out of the breach of contract in existence when the garnishment proceedings were instituted, can, after an order at law subjecting the defined indebtedness to the payment of the garnishor, invoke the aid of a court of equity to restrain the garnisheeing creditor from enforcing the payment of the amount due until the unliquidated damages can be ascertained, and set off against such indebtedness, on the ground that the principal debtor is insolvent and a non-resident of the State in which the garnishee resides, and in which the garnishment proceedings are had? In other words, is the insolvency and non-residence of the principal debtor, to whom the garnishee is indebted in a certain, definite amount, and against whom he has a valid

claim for unliquidated damages growing out of a breach of contract between them — in existence at the commencement of the garnishment proceedings — a good ground for the exercise of equitable jurisdiction after an order, or judgment at law, declaring the sum due the principal debtor applicable to the payment of the garnishor, to stay the enforcement of such order or judgment until the unliquidated damages due the garnishee can be ascertained and set off against the amount certain owing by him to the principal debtor?

The material facts and proceedings out of which this question arises are as follows: In November, 1883, the St. Louis Ore and Steel Company, of St. Louis, Missouri, (hereafter styled the St. Louis Company,) and the North Chicago Rolling Mill Company, of Chicago, Illinois, (hereafter called the Chicago Company,) were each engaged in the manufacture of steel rails for railroads. The St. Louis Company was also a miner of iron ore and the maker of pig metal. On November 6, 1883, the St. Louis Company entered into a contract with the Missouri Pacific Railroad Company for the sale and delivery to the railroad company of 24,000 tons of steel rails, in quantities of 2000 tons per month from January to December, 1884, inclusive, for which the railroad company agreed to pay for each monthly delivery of rails on receipt of bills of lading and invoice, at the rate of $18 a ton cash, and one ton of old rails for each ton delivered.

On November 19, 1883, the St. Louis Company entered into another contract with the Missouri Pacific Railroad Company, by which it agreed to sell to the railroad company the further quantity of 18,000 tons of steel rails to be delivered at the rate of about 1500 tons per month, commencing January 1 and ending in December, 1884, for which the purchaser was to pay for each delivery of 1500 tons at the rate of $37.50 a ton in cash, on the twentieth day of the month succeeding the delivery.

Having these engagements on its hands, the St. Louis Company on December 1, 1883, entered into a written contract with the Chicago Company, by which the latter agreed to furnish the former company 18,000 tons of No. 1, Bessemer

steel rails, to be delivered free on board the cars at Chicago in about equal amounts, (1500 tons,) during each month of the year 1884, at the rate of $35 per gross ton, (2240 pounds,) to be paid by the St. Louis Company on the tenth day of each month for all rails delivered during the previous month. The contract specified that the rails to be furnished by the Chicago Company should weigh 52, 56, 59, or 63 pounds per lineal yard, as per templet to be furnished by the St. Louis Company, and were to be drilled for bolts at certain distances from the ends of the rails according to their weight.

The rails were to be consigned as directed by the St. Louis Company, which was to furnish the cars for the prompt shipment thereof from Chicago, "and in the absence of the furnishing of cars upon which to load said rails, enabling the said first party (the Chicago Company) to make their deliveries as herein specified, then the said second party (the St. Louis Company) shall make their settlements and pay for said rails on the tenth day of the month, the same as though said rails had been delivered, and the non-delivery of cars shall in no way relieve the said second party from the prompt payment for the rails on the tenth day of the month as specified herein." The rails, so far as delivered, were manufactured in varying weights, upon orders given by the St. Louis Company.

On December 22, 1883, the Chicago Company entered into a contract with R. M. Cherrie & Company, of Chicago, for the purchase of 50,000 tons of iron ore, to be mined and shipped, during the year 1884, from the Pilot Knob Mine in the State of Missouri, owned and operated by the St. Louis Company. This ore was to be delivered at the Chicago Company's works in quantities of from one to seven thousand tons per month, as required by the Chicago Company, and payment therefor was to be made on the fifteenth day of each month for ore delivered during the previous month. This contract, if not made by Cherrie & Company, as agents of the St. Louis Company, was guaranteed by the latter so far as the quality of the ore and its delivery were concerned.

Cherrie & Company became financially involved, and on July 3, 1884, made an assignment to one Jenkins for the ben-

efit of their creditors, of whom the St. Louis Company was a large one. Upon the failure of Cherrie & Company the St. Louis Company assumed the former's ore contract with the Chicago Company, and thereafter, between the 4th and 21st days of July, 1884, delivered to the Chicago Company iron ore and pig metal to the amount or value of $44,916.82, for which payment was to be made by the Chicago Company on August 15, 1884.

On July 10, 1884, the St. Louis Company, being indebted to the Chicago Company in the sum of $21,536.56 for steel rails delivered during the previous month, (June,) made default in paying the same, and the next day (July 11, 1884) informed the Chicago Company by letter of its inability to pay for the June delivery of rails, and asked as a special favor to let the matter rest for a little while, as the Chicago Company had in its possession funds arising from the sale of ore and pig metal which were being delivered during the month of July. To this request no reply appears to have been made.

On July 12, 1884, the St. Louis Company again wrote the Chicago Company, expressing a doubt as to its ability to pay its debts promptly, and suggesting an arrangement by which the receivers of the Wabash Railroad Company should take certain rails and settle directly with the Chicago Company. This arrangement was not, however, consummated.

The St. Louis Company being embarrassed, and having made default in paying the interest on its several issues of bonds, secured by mortgages, was, on July 21, 1884, placed in the hands of a receiver, upon a bill filed against it in the United States Circuit Court for the Eastern District of Missouri by Robert M. Olyphant, as trustee, a citizen of New York, for the foreclosure of a second mortgage upon its property. The bill alleged the insolvency of the St. Louis Company, and upon the day of its filing, E. A. Hitchcock, the president of the company, was appointed provisional receiver of its property and assets, with instructions " to carry out and perform the contracts of the company for the purchase and sale of steel rails, and to preserve and protect all its property." This receivership was made permanent on August 7, 1884,

and the provisional instructions were renewed. Hitchcock promptly qualified both as provisional and permanent receiver.

The receiver subsequently, on August 25, 1884, made a report to the court, in which, after referring to the several contracts of the St. Louis Company with the Missouri Pacific Railroad Company for the sale of steel rails, and with the Chicago Company and others for the purchase of such rails, together with what had been done thereunder, stated that on July 30, 1884, he had received from the railroad company an order for 2045 tons of rails to be delivered in August; that he thereupon had placed with the Chicago Company an order for 1500 tons of the rails required, the price of which, under the contract between the St. Louis Company and the Chicago Company, would amount to about the sum of $52,000, and if the rails were delivered in August, that sum would have to be paid on September 10, 1884; that he had not in hand, and was not likely to have, any funds with which to meet such payment; that he had, after negotiations, failed to induce the railroad company to agree to make payment for the rails on September 10, 1884; that the railroad company had, furthermore, notified him that it was ready to carry out its contract with the St. Louis Company according to the terms thereof, but would no longer accept steel rails from other makers in the performance of that contract; that he had without success made overtures to be released from the contract of the St. Louis Company for the sale and purchase of steel rails, on the basis of the difference between the then market price of such rails, estimated at $31 per ton, and the contract prices, which terms he regarded as just to all parties, but that these overtures were not accepted. The receiver further reported that the Chicago Company had notified him by letter under date of August 6, 1884, that it was ready and willing to carry out its contract of December 1, 1883, for the manufacture and delivery of steel rails upon the terms of payment therein mentioned, and that for the failure of the St. Louis Company to carry out the said contract it would claim damages; that the Chicago Company requested an explicit statement from him,

as receiver, whether he would be prepared to pay in cash on the tenth of each month following the delivery of rails ordered by him under said contract, to which he had replied that he was not in possession of money sufficient to pay cash for such rails, but that the court under whose orders he was acting had power to make provision therefor; that to this the Chicago Company had replied that it was ready and willing to furnish the rails as ordered upon being notified that he was prepared to pay therefor on the tenth of the month following delivery.

The correspondence fully established the facts thus reported by the receiver. It is further shown in the correspondence between the receiver and the Chicago Company that the receiver proposed to pay for the rails which might be ordered and delivered under the contract with the St. Louis Company in receiver's certificates, which the Chicago Company declined to receive. The receiver admitting that he could not pay for the 1500 tons ordered for the next month, those rails were, for that reason, not manufactured by the Chicago Company.

The Chicago Company received no orders for rails from the St. Louis Company, or its receiver, for the month of July, or for any subsequent month during the year 1884. Nor did the receiver ever notify the Chicago Company that he was prepared to pay for the rails according to the terms of the contract between the two companies.

On the day of the receiver's appointment, (July 21, 1884,) the Joliet Steel Company, an Illinois corporation, commenced two attachment suits in the Superior Court of Cook County, Illinois, against the St. Louis Company, one for $7777.07, the other for $10,051.78, and on the same day and in the same court the Iron Mountain Company, a Missouri corporation, commenced an attachment suit against the St. Louis Company upon a claim for $19,782.60. No property of the St. Louis Company was attached under the writs issued in these suits, which were thereupon, and in conformity with the statutes of Illinois, served upon the Chicago Company, and R. E. Jenkins, as assignee of R. M. Cherrie & Company, as garnishees, and interrogatories were filed for each of them to answer, touching

their indebtedness to the St. Louis Company. The two suits of the Joliet Company were removed in September, 1884, to the law side of the United States Circuit Court for the Northern District of Illinois. The Chicago Company made answer in November, 1884, and a supplemental and amended answer on February 25, 1885, setting forth the transactions and matters of account between itself and the St. Louis Company, admitting an indebtedness to the latter for ore and pig iron amounting to $44,916.82, and setting up counter-claims to the amount of $56,807.50, which included the sum of $28,390.16 as damages for the failure of the St. Louis Company to carry out the steel rail contract by receiving and paying for the rails in compliance with the terms of that contract.

To this answer replication was made, and, upon the issues formed, the cause was tried before a jury. The Chicago Company introduced proof tending to establish its claim for the $28,390.16, as damages; but upon motion of the plaintiff this evidence was stricken out, and the claim for damages was disallowed by the court on the ground that, being unliquidated, it could not properly be set off at law. The disallowance of the claim for damages left a balance of $16,473.28 due by the Chicago Company to the St. Louis Company. A verdict was directed for the plaintiff for that amount, and judgment was rendered against the Chicago Company, January 13, 1886, for the sum of $16,473.28.

This garnishment proceeding was, under the Illinois statutes, in the name of the St. Louis Company, and judgment was rendered in its favor against the Chicago Company for the amount of the verdict for the use of the Joliet Company and others entitled to share therein.

In the garnishment proceedings under the attachment suit of the Iron Mountain Company in the Superior Court of Cook County a similar judgment was rendered against the Chicago Company as garnishee. By the laws of Illinois the sum adjudged against the Chicago Company as garnishee was a *quasi* trust fund for the use of both attaching creditors — the Joliet Company and the Iron Mountain Company.

Pending the garnishment proceedings, on September 26,

1884, Robert M. Olyphant, as trustee, filed what is called an ancillary bill in the United States Circuit Court for the Northern District of Illinois against the St. Louis Company, for the purpose of reaching the assets of the company in that jurisdiction. This bill recited the proceedings had, and the orders made, in the original suit, and asked the court to administer the assets of the company in that jurisdiction.

The Chicago Company having secured a stay of proceedings in both of the garnishment cases, thereupon filed its bill, or petition, on January 18, 1886, against the St. Louis Company, the Joliet Company, and the Iron Mountain Company, on the equity side of the United States Circuit Court for the Northern District of Illinois, in the ancillary suit of *Olyphant* v. *St. Louis Company.* This bill or petition of the Chicago Company, after setting out the rail and ore contracts, the default of the St. Louis Company in failing to perform the rail contract, and the resulting damages to the Chicago Company, the garnishment proceedings at law in the state and Federal courts, and the denial of its right therein to set off its claim for damages against the St. Louis Company, alleged that the St. Louis Company was insolvent, and that, being both insolvent and a non-resident, the Chicago Company was entitled to relief in equity by having its damages liquidated, and then set off against the judgments in the attachment suits. The prayer was for an injunction and relief by way of equitable set-off, and for judgment over for any balance due it by the St. Louis Company.

The Iron Mountain Company filed its answer in March, 1887, admitting that the claim on which its attachment suit was brought against the St. Louis Company had been settled, and disclaimed any further interest in the proceedings.

The answer of the other defendants, while admitting most of the allegations of the bill, denied that the St. Louis Company had violated or failed to perform the rail contract, or that the complainant had any valid claim for damages against it ; that if there had been any breach of the rail contract, the claim for unliquidated damages could not be the subject of set-off in equity any more than in law ; that if the claim were

valid, it arose out of transactions distinct from the subject-matter of the suit in which such set-off was claimed; that it did not exist on July 21, 1884, when the garnishment process was served; that from that date the garnishor acquired a lien upon and a right to the fund, due from the garnishee, in the nature of an equitable assignment, which could not be disturbed or affected by any subsequent breach of the rail contract by the St. Louis Company. A general replication was filed by the Chicago Company.

While this suit of the Chicago Company for equitable relief was pending, the St. Louis Company effected a compromise with its bond creditors by issuing new mortgage securities in lieu of the old bonds, and thereupon the Olyphant suits against the St. Louis Company in the United States Circuit Courts for the Eastern District of Missouri and for the Northern District of Illinois were dismissed. The decree of dismissal of the Illinois suit provided, however, that the petition of the Chicago Company should stand and be proceeded in as an original bill.

On April 9, 1887, the Joliet Steel Company assigned and transferred its two judgments for $9101.85 and for $10,760.41, respectively, against the St. Louis Company to David K. Ferguson, who, as such assignee, thereafter, in May, 1888, applied to be made, and was made, a party to the suit of the Chicago Company.

The cause came on for hearing in May, 1889, upon evidence as to the breach of the rail contract by the St. Louis Company, and the damages thence resulting to the Chicago Company, which was substantially the same as that introduced at law in the garnishment proceedings. The Circuit Court held that the equitable set-off sought by the bill could not be allowed for the reasons that the judgment against the Chicago Company as garnishee was for money due for pig iron and ore bought from the St. Louis Company, while the claim for unliquidated damages grew out of the failure of the St. Louis Company to receive rails under the contract of December, 1883, which had no connection with the one upon which the Chicago Company was held as garnishee; that when the

Chicago Company was served as garnishee no part of the claim urged as a set-off had accrued; that the Chicago Company then had no right of action for the recovery of that claim; that it was then uncertain whether that company would make or lose money by the further performance of the rail contract. The opinion of the court concluded by saying: "Without ruling upon other questions discussed by counsel, it is sufficient to say that the claim for unliquidated damages growing out of the failure of the St. Louis Company to receive rails under the rail contract after the failure of that company and after the commencement of the suit in attachment and the service of the writ of garnishment upon the Chicago Company was properly rejected by the court in the trial of the action at law, and cannot now be set off against the judgment rendered against the garnishee. The intervening petition is dismissed without prejudice to the right of the Chicago Company to prosecute an action against the St. Louis Company." 39 Fed. Rep. 308.

*Mr. E. Parmalee Prentice*, (with whom was *Mr. Charles S. Holt* on the brief,) for appellant.

*Mr. Henry Hitchcock* for appellees.

I. The Circuit Court, at law, properly refused to allow appellant, as garnishee, to set off its claim for unliquidated damages.

It is not necessary to argue this proposition. The correctness of that ruling depended altogether upon the proper construction of the Illinois statute; and the cases cited under this head are conclusive on the point. The rail contract, for alleged breach of which said damages are claimed, being wholly independent of the verbal agreements under which appellant purchased and was indebted for ore and pig metal, and the damages claimed for breach of the former being unliquidated, the case fell directly within the ruling in *De Forrest* v. *Oder*, 42 Illinois, 500; *Robison* v. *Hibbs*, 48 Illinois, 408; *Hawks* v. *Sands*, 3 Gilman, 227; *Clause* v.

*Bullock Printing Press Co.*, 118 Illinois, 612; *Capes* v. *Burgess*, 135 Illinois, 61; *Evans* v. *Hughey*, 76 Illinois, 115; *Sargeant* v. *Kellogg*, 5 Gilman, 273; *Ellis* v. *Cothran*, 117 Illinois, 458; *Ryan* v. *Barger*, 16 Illinois, 28, 30; *Ayres* v. *McConnel*, 15 Illinois, 230; *Kelly* v. *Garrett*, 1 Gilman, 649; *Martin* v. *Kunzmuller*, 37 N. Y. 396; *Myers* v. *Davis*, 22 N. Y. 489; *Duncan* v. *Lyon*, 3 Johns. Ch. 351; *S. C.* 8 Am. Dec. 513; *Mohawk Bank* v. *Burrows*, 6 Johns. Ch. 317.

II. Courts of law and of equity follow the same general doctrine on the subject of set-off. A set-off will be allowed in equity only on some special equitable ground : the mere existence of cross demands is not sufficient. No set-off will be allowed in equity in respect of a demand not mutual, or to arise in future, nor in respect of mutual unconnected debts in the absence of an agreement for mutual credit, nor in respect of a demand for uncertain damages arising on a breach of contract.

It will probably be conceded, certainly it will be assumed, for the purpose of this argument, that the claim for damages made by appellant for alleged non-performance by the Ore and Steel Company of the rail contract, is a claim for uncertain and unliquidated damages.

In the important case of *Duncan* v. *Lyon*, 3 Johns. Ch. 351, *S. C.* 8 Am. Dec. 513, plaintiff sought an injunction to stay proceedings at law to enforce an award made by referees under an order of the Supreme Court, and for an accounting in respect of certain partnership dealings, for a decree for his share of the proceeds of lumber sold, and to have that share set off against the damages found by the referees. On this bill a temporary injunction was allowed, which the defendant sought to have dissolved. Chancellor Kent sustained that motion, on the express ground that equity would not allow such a claim to be set off, nor would enjoin proceedings at law for that purpose pending the taking of the account.

In *Mohawk Bank* v. *Burrows*, 6 Johns. Ch. 317, there came before the same chancellor a petition for leave to set off certain claims against a judgment upon which an attorney had a lien. The defendant was insolvent, and the claim

sought to be set off was a claim for contribution, which was quite unsettled. The petition was denied, the chancellor affirming the decision in *Duncan* v. *Lyon* and repeating the statement that " there is no case to warrant the delay of satisfaction of a judgment debt on one side until an unsettled demand on the other is reduced to certainty and in a condition to be set off."

In *Hackett* v. *Connett*, 2 Edwards Ch. 73, decided by Vice-Chancellor McCoun, it was said that there is no such thing as an inherent quality or right of set-off in the creation or origin of a debt or demand. It can only arise or attach where there is a mutuality of debts of such a certain and ascertained character as to be capable of set-off or of being applied in compensation of each other. Hence, there was no equity of this sort to which the assignment in question could be subjected. The whole doctrine of set-off was critically examined by Judge Story in *Greene* v. *Darling*, 5 Mason, 202.

Eight years later, the doctrine of equitable set-off was again thoroughly considered by Mr. Justice Story in *Howe* v. *Sheppard*, 2 Sumner, 409. It was held, affirming *Greene* v. *Darling*, and citing approvingly Chancellor Kent's decisions in *Duncan* v. *Lyon*, 3 Johns. Ch. 358, and *Dale* v. *Cooke*, 4 Johns. Ch. 11, that the known rule in courts of equity is that they follow the law in regard to matters of set-off, unless there is some intervening natural equity going beyond the statutes of set-off which constitutes the general basis of set-off at law — but the only case of natural equity mentioned is that of mutual credits given or agreed for.

In this case also the fact of insolvency was urged as a ground of relief. The equitable set-off prayed for was denied on other grounds, but the court plainly intimated that insolvency would not have sufficed, referring to the case of *Simson* v. *Hart*, 14 Johns. 63. See also *Scammon* v. *Kimball*, 92 U. S. 362; *Wade* v. *Wade*, 12 Illinois, 89; *Buckmaster* v. *Grundy*, 3 Gilman, 626; *Raleigh* v. *Raleigh*, 35 Illinois, 512; *Gay* v. *Gay*, 10 Paige, 369.

III. Appellant's contention as to insolvency and non-residence is not valid under the facts in proof in this case.

The sole ground upon which it is now sought to reverse the decree below is that the St. Louis Ore and Steel Company was insolvent and a non-resident; and that since this made it impossible for appellant to recover the damages claimed by it unless by means of the equitable set-off prayed for, that is a sufficient ground of equity for such relief.

The case of *Schuler* v. *Israel*, 120 U. S. 506, 510, seems to be the authority most relied on for appellant. But the passage quoted from Mr. Justice Miller's opinion is admitted to have been merely "incidental to the point decided in that court," — that is, as the opinion shows, simply a *dictum*, couched in the most general terms. Giving to that general statement all weight to which it may be entitled, it is inapplicable on its face to any case in which the complainant should fail to allege and prove, not merely that the demand sought to be set off was at some former time in danger of being lost, but that it had become and continued to be in fact irrecoverable unless the set-off were allowed, because the judgment creditor was in fact insolvent at the time when the relief prayed for was to be made effectual.

*A fortiori* must this be true, when a court of equity must, if the set-off be allowed, thereby deprive the opposing claimant of all benefit from a judgment recovered by him in the exercise of superior diligence. In such case *Zogbaum* v. *Parker*, 55 N. Y. 120, is directly in point.

IV. Appellant's claim for unliquidated damages cannot be set off against the judgment recovered by the Joliet Steel Company against appellant as garnishee. Said claim is based upon alleged violations by the St. Louis Company of the rail contract of December 1, 1883, which occurred, if at all, after July 21, 1884, on which day appellant was summoned as garnishee. At that date no right of action for damages for breach of said rail contract existed in favor of appellant. No such claim or right of action arising after that date can be set off by appellant against said judgment, the lien of which relates back to July 21, 1884, the date of said attachment, and is prior and superior to any supposed equity here alleged in favor of appellant.

The question whether, at the date of the attachment, July 21, 1884, appellant's claim for unliquidated damages for breach of the rail contract, was an existing right of action, lies at the very threshold of this controversy.   Our contention is:

1. That on July 21, 1884, when appellant was summoned as garnishee of the St. Louis Company in the attachment suit brought by the Joliet Steel Company, a lien upon its then existing and admitted indebtedness to the St. Louis Company was created, which became complete and was merged in the judgment rendered against said garnishee in favor of the Joliet Steel Company on January 13, 1886.

2. That said judgment, when rendered, related back to the date of the attachment, the lien of which became consummate as of that date in favor of the Joliet Steel Company, not only as against the defendant in attachment, but as against all third persons not having valid prior claims to the fund attached.

3. That, except in failing to pay, on July 10, 1884, for the rails delivered in June, the St. Louis Company had not, on or before July 21, 1884, in any respect failed to comply with its rail contract of December 1, 1883.

4. That if such non-payment on July 10, 1884, was a violation of said contract, appellant could recover no damages therefor except by way of interest at six per cent per annum on the amount due and unpaid; and that such interest, if recoverable at all, should have been claimed, and if claimed would have been allowed to the garnishee, in the garnishment suit, and not having been claimed therein, cannot now be claimed by way of equitable set-off against said judgment.

5. That, without conceding that any cause of action for damages for breach of said rail contract arose in favor of appellant and against the St. Louis Company after July 21, 1884, certainly no such cause of action existed in appellant's favor at that date, under the facts in proof.

6. That the judgment in favor of the Joliet Steel Company against appellant as garnishee, rendered on January 13, 1886, for an admitted debt arising from transactions wholly distinct from the rail contract, is a valid and meritorious claim, the right to enforce which, by execution against the garnishee,

relates back to the date of the attachment and is prior and superior to any right of action or supposed equity subsequently arising, if any, as between the garnishee and the defendant in attachment.

7. That, even if a valid claim for unliquidated damages in favor of appellant against the St. Louis Company, for breach of the rail contract, were conceded to have arisen after July 21, 1884, under circumstances such that equity would permit appellant to set off such claim against a judgment previously recovered against appellant by the St. Louis Company for its own benefit, yet, under the facts above stated equity will not allow such claim for damages to be set off against this judgment, because the right of the Joliet Steel Company and its assignee to enforce such judgment was, and is, a prior and superior equity to any which, on the facts in proof, could arise in favor of appellant after that date. See *Drake on Attachment*, §§ 223, 224, 453, 542, 615 *a*; *Hall* v. *Kimball*, 77 Illinois, 161; *Chicago, Danville &c. Railroad* v. *Field*, 86 Illinois, 270; *Reeve* v. *Smith*, 113 Illinois, 47; *Bank of America* v. *Indiana Banking Co.*, 114 Illinois, 483.

Mr. JUSTICE JACKSON, after stating the case, delivered the opinion of the court.

From the decree dismissing this bill the present appeal is prosecuted, and the errors assigned by the appellant may be embraced in the general proposition that the court below erred in declining to adjudicate and determine the amount of the damages sustained by the Chicago Company from the breach of the rail contract and set off the same against the judgment at law, and in dismissing the bill, even though such dismissal was without prejudice to the right of the Chicago Company to bring suit for the recovery of such damages.

In addition to the reasons on which the court below denied relief and dismissed the bill, it is urged by the appellee that the equitable ground for relief, viz., the insolvency of the St. Louis Company, ceased to exist before the final decree was rendered. It is urged that its solvency was shown by the

settlement of its debts and the dismissal of the foreclosure
suits against it and the discharge of the receiver. There are
several answers to this suggestion. *First*, the fact relied upon
to establish such restored solvency, viz., the compromise of the
company's bonded indebtedness by issuing new obligations
secured by mortgage on all its tangible property, fails to show
any actual improved financial condition, such as would be
available to the Chicago Company in enforcing its claim for
damages; *Second*, as appears in the record, there were other
claims against the St. Louis Company which were not set-
tled by the compromise which terminated the foreclosure
suits; *Third*, the alleged restored solvency of the St. Louis
Company was not set up by supplemental pleading of any
kind in this suit, although there was ample time and opportu-
nity to do so between March, 1887, and May, 1889, when this
cause was finally heard; as a matter of defence, arising after
the case was at issue, the restored solvency of the St. Louis
Company must have been set up by supplemental answer or
other appropriate pleadings, (Story's Equity Pleading, §
393;) *Fourth*, equitable jurisdiction having once rightfully
attached, cannot be defeated by matter subsequently arising
which does not go to the merits of the complainant's case. The
state of facts existing when the bill was filed must be looked
to in determining the question of equitable jurisdiction, which
in this case is rested on the ground of insolvency and non-resi-
dence. The latter fact is not questioned; as to the former,
the Joliet Steel Company, by its petition, filed May 1, 1886,
in the Olyphant foreclosure suit in the Northern District of
Illinois, asking that the receiver be required to give bond as
such in the sum of $50,000, to account for the assets received
in that jurisdiction, distinctly alleged that the St. Louis Com-
pany was an insolvent, non-resident corporation, and on the
strength of its petition the receiver gave bond to cover the
assets within the jurisdiction of the Circuit Court of the United
States for the Northern District of Illinois, and the receiver
thereafter, with the consent of the Joliet Company, compro-
mised the claim of the St. Louis Company against Cherrie &
Company, and obtained securities and assets thereunder, which

were allowed to be removed from the jurisdiction of the court, or applied otherwise than to the debt of the Joliet Company.

It is not shown by the record that the St. Louis Company was restored to a state of solvency before the final decree; but if that fact had been properly shown, it was not set up as a defence in the present suit, and it cannot now be invoked on behalf of the Joliet Company or its assignee.

It admits of no question that the St. Louis Company made default in the performance of the rail contract. It failed in the payment of the sum of $21,536.56 on July 10, 1884, for steel rails delivered in June. This default continued throughout the year 1884. Neither the St. Louis Company nor its receiver gave any order or orders for the manufacture of rails for July delivery. On the order for 1500 tons of rails, given for August delivery, the receiver was confessedly not prepared to pay, nor was any provision made by which the Chicago Company could reasonably expect payment therefor on September 10, 1884. The receiver had made every possible effort to raise funds by the sale of receiver's certificates, and had failed. He had nothing to pay with except "certificates," and the Chicago Company had declined to take them. It was certainly not bound to proceed with the manufacture and delivery of rails under the August order, after being notified in advance that the receiver was not prepared, and did not expect to be in funds to pay for the same unless certificates were accepted. For the reason that he had nothing to pay with, except "certificates," the receiver considered, as he stated to the president of the Chicago Company, in a letter dated September 26, 1884, that it would have been wrong to have asked the Chicago Company to make and forward rails without immediate or prospective means of paying for the same. So no further orders were given for rails, although the Chicago Company repeatedly, during August, September, and October, expressed its readiness and ability to fill all orders when the receiver was prepared to pay therefor according to the terms of the contract. The Chicago Company, early in October, indicated its willingness to reduce the price of the undelivered rails to $30 per ton, upon prompt

settlement in cash, according to the contract, but this proposition was not accepted.

Under these circumstances there was a clear breach of the rail contract on the part of the St. Louis Company. The first default occurred on July 10, 1884, in failing to pay the amount then due the Chicago Company. It was further in default in not giving an order to manufacture rails for July, which was continued during the succeeding months of the year 1884; so that at the close of December, 1884, when the time for the final performance of the contract expired, there were about 10,618 tons of rails that the St. Louis Company had failed to order, receive, and pay for at the contract price of $35 per ton. Steel rails continued to decline from July, 1884, to January, 1885, the price running down to $29.50 a ton between those dates.

It is claimed for the appellee that as the Chicago Company had not rescinded and terminated the rail contract for the July breaches thereof — if entitled so to do — it was not in a position to bring suit for damages when the garnishor's right became fixed. This, however, does not affect the merits of this case. The Chicago Company was not bound to treat the contract as at an end upon the first breach thereof by the St. Louis Company. It had a right to await the expiration of the time for its final performance, and then make its claim for the entire breach. In the view we take of the question it is not material to determine at what precise date there was such a breach as would entitle the Chicago Company to damages upon the entire contract. The material thing is that the contract (for the breach of which the claim for damages arises) was in existence when the garnishment process was served. It had then been broken in one particular, if not in more, and from the situation and embarrassed condition of the St. Louis Company there was almost a certainty that it would fail to perform the contract in the future. The Chicago Company gave repeated notices to the receiver of its readiness and willingness to fulfil the contract on its part. It could only manufacture rails as they were ordered, and their weights specified. It notified the receiver time and again that it

would claim damages. That it sustained damages to the extent of the difference between the contract and the market price of steel rails is clear beyond all controversy. The liability of the St. Louis Company for these damages is equally clear, but the amount thereof being unliquidated could not properly be set off in the attachment proceeding at law. Under these circumstances and conditions, has the Chicago Company any right to relief in equity by way of equitable set-off? Would it be just and equitable to compel the garnishee to pay its indebtedness to the St. Louis Company for the benefit of a stranger, and then be left to either lose its valid claim for damages, or follow its non-resident insolvent debtor into another jurisdiction in the effort, more or less experimental and expensive, to collect such claim? If the St. Louis Company was the beneficial plaintiff in the judgment at law, or the case stood alone between it and the Chicago Company, there could be little or no doubt that a court of equity would, under the facts stated, afford the latter relief by way of equitable set-off.

Cross-demands and counter-claims, whether arising out of the same or wholly disconnected transactions, and whether liquidated or unliquidated, may be enforced by way of set-off whenever the circumstances are such as to warrant the interference of equity to prevent wrong and injustice.

Again, it is well established that equity will entertain jurisdiction and afford relief against the collection of a judgment where in justice and good conscience it ought not to be enforced, as where there is a meritorious, equitable defence thereto, which could not have been set up at law, or which the party was, without fault or negligence, prevented from interposing. Illustrations of these general principles are found in the cases of *Leeds* v. *Marine Ins. Co.,* 6 Wheat. 565; *Scammon* v. *Kimball,* 92 U. S. 362; *Crim* v. *Handley,* 94 U. S. 652; *Embry* v. *Palmer,* 107 U. S. 3; *Knox County* v. *Harshman,* 133 U. S. 152; *Marshall* v. *Holmes,* 141 U. S. 589.

The adjustment of demands by counter-claim or set-off rather than by independent suit is favored and encouraged by

the law, to avoid circuity of action and injustice. *Railway Co.* v. *Smith*, 21 Wall. 255.

By the decided weight of authority it is settled that the insolvency of the party against whom the set-off is claimed is a sufficient ground for equitable interference. *Leeds* v. *Marine Ins. Co.*, 6 Wheat. 565; *Lindsay* v. *Jackson*, 2 Paige, 581; *Gay* v. *Gay*, 10 Paige, 369; *Pond* v. *Smith*, 4 Connecticut, 297, 302; *Robbins* v. *Holley*, 1 T. B. Mon. 194; *Hinrichsen* v. *Reinback*, 27 Illinois, 295; *Raleigh* v. *Raleigh*, 35 Illinois, 512; *Hall* v. *Kimball*, 77 Illinois, 161; *Chicago, Danville &c. Railroad* v. *Field*, 86 Illinois, 270; *Doane* v. *Walker*, 101 Illinois, 628; *Davis* v. *Milburn*, 3 Iowa, 163; *Tuscumbia &c. Railroad* v. *Rhodes*, 8 Alabama, 206; *Wray* v. *Furniss*, 27 Alabama, 471; *Keightley* v. *Walls*, 27 Indiana, 384; *Wulschner* v. *Sells*, 87 Indiana, 71; *Laybourn* v. *Seymour*, (Minn.,) 54 N. W. Rep. 941; *Rothschild* v. *Mack*, 115 N. Y. 1; *Richards* v. *La Tourette*, 119 N. Y. 54; *Schuler* v. *Israel*, 120 U. S. 506.

In *Schuler* v. *Israel*, 120 U. S. 506, 510, it was said by Mr. Justice Miller, speaking for the court, that, "While it may be true that in a suit brought by Israel against the bank it could in an ordinary action at law only make plea of set-off of so much of Israel's debt to the bank as was then due, it could, by filing a bill in chancery in such case, alleging Israel's insolvency, and that, if it was compelled to pay its own debt to Israel, the debt which Israel owed it but which was not due would be lost, be relieved by a proper decree in equity; and as a garnishee is only compelled to be responsible for that which, both in law and equity, ought to have gone to pay the principal defendant in the main suit, he can set up all the defences in this proceeding which he would have in either a court of law or a court of equity."

It is suggested by the appellee that this was merely "incidental to the point decided in that case," but the proposition it announces is supported by sound principle and authority, and the Illinois decisions are in full accord therewith.

In addition to insolvency, it is held by many well-considered

decisions, including those of Illinois, that the non-residence of the party against whom the set-off is asserted is good ground for equitable relief. *Quick* v. *Lemon,* 105 Illinois, 578; *Taylor* v. *Stowell,* 4 Met. (Ky.) 175; *Forbes* v. *Cooper,* 88 Kentucky, 285; *Robbins* v. *Hawley,* 1 T. B. Mon. 18; *Edminson* v. *Baxter,* 4 Hayw. (Tenn.) 112; *Davis* v. *Milburn,* 3 Iowa, 163.

It is not deemed necessary to review these cases and make quotations from them. They fully establish the principles for which they are cited. There is nothing in the Illinois statutes on the subject of attachment and garnishment inconsistent with the doctrine of the foregoing decisions. Applying the principle they announce to the present case, it admits of no doubt that the Chicago Company is entitled to the relief it seeks as against the St. Louis Company. The question then remains whether the attachment proceedings, or the garnishment process thereunder, resulting in the order or judgment at law declaring the Chicago Company's ascertained indebtedness liable to the payment of the Joliet Company's judgment against the St. Louis Company, in any way changes or defeats the equity or right of the Chicago Company to the same relief?

The court below seems to have entertained the theory that while the St. Louis Company may have failed to perform the rail contract, the Chicago Company's right to claim damages for the entire breach thereof had not accrued July 21, 1884, when the garnishment process was served and the garnishor's rights attached, and, furthermore, that such claim, however meritorious as against the St. Louis Company, could not form the subject of an equitable set-off, especially as against a demand arising out of a disconnected transaction. This proceeds upon the assumption, as appellees here contend, that the garnishor by the service of the garnishment acquired such a lien upon or equitable right to the funds due from the garnishee which could not be disturbed or affected by any right or equity subsequently accruing to the latter as against the principal debtor. The service of garnishment neither changed nor interrupted the contractual relations existing between the

Chicago Company and the St. Louis Company. The rights and equities existing, and to arise out of those contractual relations, were in no way terminated or defeated by that service. The legal operation and the effect of the garnishment proceedings and of the final order therein made was only to impound what was legally and equitably due from the garnishee after the adjustment of the claims between the latter and the principal debtor, and place it beyond the control of the debtor and subject to collection for the benefit of the attaching creditor. The claim made by the appellee that the garnishment service operated as an equitable assignment to the garnishor of the due indebtedness from the garnishee cannot be sustained either upon reason or authority. The final order in that proceeding does not have the legal effect and operation of transferring the Chicago Company's due indebtedness to the St. Louis Company, and from the latter to the Joliet Company. The Illinois statutes in relation to garnishment are substantially the same as the generality of statutes on that subject, and contain no provision sustaining the proposition that either the service of the writ or the order made in the proceedings operates to transfer the debt, but only binds it and prevents the principal debtor from receiving it.

The English law upon the subject of garnishment and its effect differs in no material respect from that of Illinois, and in *Chatterton* v. *Watney*, 17 Ch. D. 259, it was held that a garnishee order did not have the effect of transferring the debt from the garnishee.

In the case of *Ex parte Chinery*, 12 Q. B. D. 342, it was held by Lord Justice Cotton that a garnishee order absolute was not a final judgment against the garnishee, and did not make the garnishor a creditor of the garnishee. In the subsequent case of *In re Combined Weighing and Advertising Machine Co.*, 43 Ch. D. 99, 104, 105, 106, the effect of a garnishee order was again under consideration, and it was held that the garnishee order did not effect any transfer, legal or equitable, of the debt owing by the garnishee, or create the relation of creditor and debtor as between the garnishor and the garnishee.

Cotton, L. J., said: "A garnishee order attaching the debt and enabling the person who has obtained the order to give a good discharge, does not come within the principle of equitable assignment," so as to make the garnishor a creditor of the garnishee. Bowen, L. J., said: "I cannot see that this statutory relation, which was created originally by the *Common Law Procedure Act* of 1854, and was perpetuated in the rules under the *Judicature Act*, is really a relation involving the creation of a fresh debt. There cannot be said to be any equitable debt. There is no assignment in equity, and I cannot see that there is any legal debt. There is an order of a court of common law that a sum equal to the original debt shall be paid by the garnishee to the judgment creditor, or as an alternative that execution may issue; but I think that the relation which is created by that section, and the order made under it, does not create a debt at all." Fry, L. J., said: "It is plain to my mind that there is no transfer of the debt. It is equally plain to my mind that the garnishee order, therefore, does not make the garnishor a creditor of the garnishee. What the order does is this, it gives the garnishor certain statutory rights; it enables the garnishor to say to the garnishee, 'You shall not pay to your creditor the money which you owe him.' It enables him to give a valid receipt and discharge for the money. It enables him in the event of the money not being paid to obtain execution. He has all those rights, but there is no transfer of the debt, and he is not created a creditor."

The proposition here laid down is in harmony with the generally recognized principle that the rights of the garnishor do not rise above or extend beyond those of his debtor; that the garnishee shall not, by operation of the proceedings against him, be placed in any worse condition than he would have been in had the principal debtor's claim been enforced against him directly; that the liability, legal and equitable, of the garnishee to the principal debtor is a measure of his liability to the attaching creditor, who takes the shoes of the principal debtor and can assert only the rights of the latter. *Towner* v. *George*, 53 Illinois, 168; *Richardson* v. *Lester*, 83 Illinois, 55; *Henry*

v. *Wilson,* (Iowa,) 51 N. W. Rep. 1157; *Huntington* v. *Risdon,* 43 Iowa, 517.

From these propositions and authorities it follows that the Chicago Company is entitled to assert against the Joliet Company the equitable set-off it could enforce against the St. Louis Company in respect to its claim for damages.

It is hardly necessary to observe that the appellee Ferguson, having taken an assignment from the Joliet Company *pendente lite,* occupies the same position as his assignor, and is subject to the same equity. It is sought to defeat this right of the Chicago Company by invoking in favor of the Joliet Company and its assignee, Ferguson, the doctrine of relation so as to antedate the claim for damages. This cannot be done for two reasons: first, because the breach of contract, on which the claim for damages is based, had in fact commenced before the garnishment writ was served; second, if that had not been the case, the contract, for the non-performance of which the right for damages arises, was in existence when the garnishment proceedings were instituted.

This unquestioned fact is very material, if not controlling of the case. The court below did not give the fact that the claim for damages arose under and by virtue of a contract in existence prior to the date of the attachment its due weight and importance, as will be seen by a brief reference to the authorities bearing upon the question. Thus in *Boston Type Co.* v. *Mortimer,* 7 Pick. 166, 167, the garnishee, when summoned, was indebted to the defendant, but was at the same time liable as accommodation endorser of a note of the defendant for a large amount which became due after the garnishment, and was protested for non-payment and paid by the garnishee before he made his answer. The court held that the garnishee could set off against his indebtedness to the principal defendant the amount of the notes so paid, and in giving its decision observed: "Under these circumstances we think he cannot be held as trustee, for it would be against justice that he should be held to pay a creditor of his debtor the only money by which he can partially indemnify himself."

In the recent case of *Lannan* v. *Walter,* 149 Mass. 14, 15,

the court said: "The answer of the trustee on which it was discharged is, in effect, that at the time of the service of process it had in its deposits, to the credit of the defendants, $927.10, and that at the same time it held three promissory notes, which it had discounted for the benefit of the defendants, and on which they were endorsers; that since said service these notes have all matured; that the liability of the endorsers has been made absolute by due demand and notice. The makers and endorsers have all become insolvent, and the notes remain in its hands wholly unpaid, except that a small sum has been received on one of them. The amount due on each note is considerably more than $927.10. The counsel for the trustee contends that it has the right to set off the sum of money due from the defendants on any one of these notes against the deposit. We regard it as settled that 'if before final answer the debtor becomes indebted to the' trustee 'on any contract entered into before the service of the writ, the latter shall have a right of set-off, and be chargeable only with the final balance, if one should be due.' *Boston Type Co.* v. *Mortimer,* 7 Pick. 166; *Smith* v. *Stearns,* 19 Pick. 20; *Nickerson* v. *Chase,* 122 Mass. 296; *Eddy* v. *O'Hara,* 132 Mass. 56, 61; Pub. Stat. c. 183, § 27."

So in *Farmers' and Merchants' Bank* v. *Franklin Bank,* 31 Maryland, 404, 412, the court, allowing a set-off which matured after action brought, said: "There is nothing in the attachment law of this State to justify the conclusion that it was designed, by allowing garnishment to be made, to place the garnishee in a worse position in reference to the rights and credits attached than if he had been sued by the defendant. The attaching creditor seeks to have himself substituted to the rights of his debtor as against the garnishee, and by levying his attachment he acquires no superior right to that of his debtor. The right of condemnation must, therefore, be subject to any such right of set-off or discharge existing at the time of garnishment, as would be available to the garnishee if he were sued by the defendant. Any other rule would in many cases work gross injustice and might be subject to great abuse. . . . This right of set-off or discharge, and

as against the attaching creditor, should not, however, extend to any matter originating by the action of the garnishee subsequent to garnishment, as otherwise it would be in the power of the garnishee to defeat the right of condemnation, which should not by any means be allowed."

In the first of the above cited cases the liability of the garnishee was conditional and undeterminate at the time of the service of the garnishment process, and his right to claim against the principal debtor did not become fixed until long after the service of process, so that the garnishee had no cause of action against the principal debtor when the attachment writ was served. Also in each of the other cases the set-off allowed matured after the service of garnishment, but arose under a contract entered into before the service of the writ. In other words, the principle established by these cases is that, whatever rights the garnishee may have under existing contracts with the principal debtor, he is entitled to have the benefit thereof as against the attaching creditor.

The latter clause of the quotation from the case of *Farmers' and Merchants' Bank* v. *Franklin Bank, supra,* lays down the correct rule to be applied in cases of this character, and that rule is, that, while the garnishee may not, after service of the writ, by his own action acquire set-offs or counter-claims against the principal debtor to the prejudice of the attaching creditor, he may properly avail himself of all claims fairly arising out of contracts with the principal debtor which were in existence when the attachment was commenced, and under or out of which his claim against the principal debtor arises.

From the foregoing considerations we think the court below should have ascertained the damages growing out of the failure to perform the rail contract on the part of the St. Louis Company, and having ascertained the amount of such damages the same should have been allowed the complainant as a set-off against the sum of $16,473.28, found to be due from it to the St. Louis Company, and for which the garnishee order or judgment was rendered; and if that adjustment left

any balance due the complainant from the St. Louis Company, a personal decree should have been rendered therefor.

*The judgment of the court below is accordingly reversed, and the cause remanded, with directions to proceed therein in conformity with this opinion.*

MR. CHIEF JUSTICE FULLER having been of counsel, and MR. JUSTICE WHITE not having been a member of the court when the case was argued, took no part in its consideration and decision.