## BROWNLEY v. PEYSER et al.
### No. 6963.

United States Court of Appeals for the District of Columbia.

Decided June 13, 1938.

338

Leslie C. Garnett, of Washington, D. C., for appellant.

Hugh H. Obear and Edmund D. Campbell, both of Washington, D. C., for appellee receivers.

Paul E. Lesh, of Washington, D. C., for appellee Washington Properties, Inc.

Before GRONER, Chief Justice, and MILLER and EDGERTON, Associate Justices.

EDGERTON, Associate Justice.

The appellant Brownley is a statutory receiver appointed by the Circuit Court of the City of Baltimore for the Wardman Realty and Construction Company. He claims a certain share of the unmortgaged assets in the hands of the appellees, Peyser and Tumulty, as receivers of the Wardman Real Estate Properties, Inc. He is asserting this claim in the equity receivership of the Properties Company, which has grown out of a general creditors' suit and is pending in the District Court of the United States for the District of Columbia. That court has rejected his claim, and he appeals.

The Construction Company owned all of the capital stock of the Properties Company. Both are Maryland corporations. In July, 1929, the Construction Company leased from its subsidiary, the Properties Company, a number of buildings in Washington, D. C., including Wardman Park Hotel, Chastleton Apartments, Cathedral Mansions, and the Carlton Hotel. The lease was expressly subject to certain mortgages. The holding company and lessee, the Construction Company, agreed to pay as rent a sum sufficient to cover all interest and amortization requirements on two bond issues of the Properties Company and on the notes of that Company as they came due, but not less than $1,500,000 per year. The lessee also agreed that it would pay water rates and taxes levied against the properties and would keep them repaired and insured. From the date of the lease until February 26, 1931, the properties were operated by the Construction Company. On February 28, 1931, it was in default in rent to the extent of $654,000, real estate taxes had accrued against the properties in the sum of about $47,000, and about $30,000 of personal property taxes assumed by the Construction Company were unpaid.

From some unnamed date, after the making of the lease, until February 26, 1931, the officers and directors of the two companies were identical. At that time there was a severance. On March 7, 1931, as a result of negotiations carried on both before and after the severance, the lease was cancelled and control of the properties was surrendered by the Construction Company to the Properties Company as of February 28, 1931. During these negotiations, the men who after the severance were officers of the Construction Company were advised by counsel independent of the Properties Company. In the cancellation agreement the Properties Company assumed certain accounts payable and accrued liabilities of the Construction Company, and also the real estate and personal property taxes which the Construction Company was obligated to pay; while the Construction Company turned over to the Properties Company cash, inventories, deferred and prepaid items, and accounts receivable less reserves therefor, to an aggregate amount equal to the sum of the items assumed by the Properties Company, viz., $240,702.40. In addition to the inventories, which were appraised for the purposes of the cancellation agreement at $27,000, the Properties Company took over "without adjustment" coal, hardware, soaps, cleaning materials and other goods on hand in the apartment houses on February 27, 1931. The value of these goods was estimated by different witnesses at from $5,000 to $25,000. In 1929, at the commencement of the lease, the Construction Company had taken over similar materials from the Properties Company without adjustment. The Construction Company's indebtedness of $654,000 to the Properties Company was not affected by the agreement.

In accordance with the agreement, the Properties Company paid all the obligations of the Construction Company which it had assumed except claims amounting to $924, which were disputed, and except the personal property taxes which were afterwards asserted to be due in larger amounts and are

now in litigation. All "ordinary trade accounts" of the Construction Company, apart from the $924 referred to, were paid. All interest due on the debenture bonds of the Construction Company had been paid. Appellant asserts and appellees do not deny that the Construction Company was insolvent, and that not all its bills have been paid. On the other hand, the Construction Company had assets, the amount of which does not appear in the record, which were not assigned to the Properties Company.

From March 1 until July 14, 1931, the properties were operated by the Properties Company. Interest due March 1 on its First and Refunding-Mortgage bonds was defaulted (Thomas v. Central Hanover Bank & Trust Co., 64 App.D.C. 96, at page 97, 75 F.2d 227), and the Trustee under the mortgage securing the bonds sued in the United States District Court for the District of Columbia to foreclose the security. On July 14, 1931, that court appointed the appellees Peyser and Tumulty as receivers of all the Properties Company's mortgaged assets. Those assets were sold at foreclosure to Washington Properties, Inc., an organization of creditors of the Properties Company. On September 24, 1934, the sale was confirmed by this court in Thomas v. Central Hanover Bank & Trust Company, 64 App. D.C. 96, 75 F.2d 227, certiorari denied 294 U.S. 726, 55 S.Ct. 636, 79 L.Ed. 1257. The properties sold for far less than the amount of the bonds, and on December 6, 1933, the trustee under the mortgage secured a deficiency judgment against the Properties Company for $10,470,039.09, the difference between the amount of the bonds and the net proceeds of foreclosure. Meantime, in July, 1931, in a general creditors' suit, the United States District Court for the District of Columbia appointed the same receivers, Peyser and Tumulty, for all the unmortgaged assets of the Properties Company in the District of Columbia. These receivers, the appellees, now have on hand in this second receivership approximately $198,000. The deficiency judgment just referred to has been allowed as a claim against the unmortgaged assets of the Properties Company in the hands of appellees Peyser and Tumulty. The holders of 93 per cent of the bonds entitled to share in the proceeds of that judgment and claim, who organized the appellee, Washington Properties, Inc., have transferred their bonds and claims to it. It has also a claim against the Properties Company's unmortgaged assets, amounting to over $2,200,000, on account of junior bonds

and notes of that Company which it has acquired. This claim also has been allowed in these equity receivership proceedings.

On July 31, 1931, the Circuit Court of the City of Baltimore adjudicated the Construction Company insolvent and appointed Brownley, the appellant, statutory receiver. He claimed from the appellees Peyser and Tumulty, out of the unmortgaged assets of the Properties Company, $30,684.60 for unpaid personal property taxes and $47,653.68 for unpaid real estate taxes, said to have been improperly allowed as charges against the Construction Company in the cancellation agreement; $27,318.24 for inventories transferred by the Construction Company to the Properties Company under the agreement; and an unstated amount for the value of the uninventoried assets transferred without adjustment. He also made other claims which he has abandoned. In his reply brief he states the total amount of his claim as "at least" $105,885.37. This is approximately the sum of the three specific items just enumerated. The Special Master appointed to hear claims against the receivers Peyser and Tumulty has wholly rejected appellant's claims. The present appeal is taken from an order of the District Court confirming the Special Master's report.

The Special Master found that on February 28, 1931, the effective date of the cancellation agreement, the Construction Company owed the Properties Company $654,000 for rent under the lease; that this debt was not affected by the agreement; that a reserve was set up against it by the Properties Company; and that it was afterwards arbitrarily written down on the Properties Company's books to $1. This amounts to a finding that this debt was still unpaid on May 6, 1933, when appellant filed his claim with the Special Master, and on April 9, 1936, when the Special Master made his report from the confirmation of which by the District Court this appeal is taken. Appellant does not except to or dispute this finding. The agreed statement impliedly admits it in Paragraph XIII, and stipulates in Paragraph XVIII that the statements of fact in the Master's report contain a correct digest of the testimony before him so far as they are consistent with the agreed statement.

Much of appellant's argument proceeds as if it were immaterial which was the holding corporation and which the subsidiary. There is danger that a sole stockholder will take advantage of his corporation, and so

of its creditors, and rules have grown up to check that danger. It is less likely that a corporation will take advantage of its sole stockholder, and so of his creditors; and the same rules do not apply. Appellant's position is that the tail wagged the dog. Actually, the wagging was of the normal sort. The subsidiary Properties Company was made to lease its property to the parent Construction Company. The lease resulted in great advantage to the parent company and some of its creditors, and great disadvantage to the subsidiary company and its creditors. The parent Construction Company collected the income from the subsidiary Properties Company's buildings, and paid the interest on the Construction Company's obligations to third persons, while it defaulted so heavily in the rent due to the Properties Company that the Properties Company could not meet the interest due on its obligations on March 1, 1931. Up to March 7, 1931, when the cancellation agreement was made, it was the subsidiary Properties Company and its creditors, not the parent Construction Company and its creditors, which suffered from the lease and the resulting dealings between the companies. Did the cancellation agreement so reverse the situation as to give to the insolvent parent company, which was and remained deeply in debt to its insolvent subsidiary, a valid claim to compete with the subsidiary's creditors for its insufficient assets? We think not.

Perhaps the transfer of assets by the Construction Company to the Properties Company on account of taxes which the Construction Company was obligated to pay, considered by itself, constituted a preference by an insolvent corporation of one of its creditors. Cases differ as to whether an insolvent corporation has an insolvent individual's unquestioned privilege to prefer one creditor over others. The weight of authority allows it. 19 A.L.R. 320. The reason for disallowing it, when it is disallowed, is that the preference seems unfair. Here there was nothing unfair about the alleged preference; on the contrary, it tended in some small degree to remedy a grossly unfair situation which had resulted from an abuse by a parent corporation of the rights of its subsidiary and the interests of the subsidiary's creditors. The assets which the parent debtor turned over to its subsidiary creditor amounted to a small fraction of the debt due. There is nothing to show that a similar fraction could not

have been paid on all other debts of the parent company. Moreover, those assets appear to have been improperly acquired by the parent at the expense of the subsidiary and by the use of the subsidiary's property.

Perhaps the transfer of inventories by the Construction Company to the Properties Company was a violation of the Bulk Sales Act. D.C.Code, tit. 11, §§ 14–18. Perhaps the transfer of certain materials without "allowance" was, considered by itself, a gift by an insolvent corporation, subject to be upset in the interest of its creditors. We need not decide those questions. Any claims which appellant may possibly derive from them are offset many times over by the Construction Company's debt to the Properties Company. "Cross demands and counterclaims, whether arising out of the same or wholly disconnected transactions, and whether liquidated or unliquidated, may be enforced by way of set-off, whenever the circumstances are such as to warrant the interference of equity to prevent wrong and injustice. * * * By the decided weight of authority it is settled that the insolvency of the party against whom the set-off is claimed is a sufficient ground for equitable interference." North Chicago Rolling-Mill Co. v. St. Louis Ore & Steel Co., 152 U.S. 596, 615, 616, 14 S.Ct. 710, 715, 38 L.Ed. 565. Cf. Fedarwisch v. Alsop, 18 App.D.C. 318; Fitzgerald v. Wiley, 22 App.D.C. 329. And the principle that he who seeks equity must do equity applies to the Construction Company's receiver as well as to the Construction Company itself. The Construction Company and its creditors have profited greatly, and the Properties Company and its creditors have lost heavily, from the whole series of dealings between the companies which resulted from the lease. It would be highly inequitable to impose further loss upon the Properties Company's creditors by permitting appellant to enforce his claim against its assets without deduction for the far larger debt of the Construction Company to the Properties Company. It is not clear just how or when the existence of appellant's debt to appellee was asserted and established before the Master. Possibly appellee did not assert it at all until the statute of limitations had run against it. If that were shown, it would not aid appellant. A plaintiff who seeks equity is not excused for failure to do equity by the fact that a statute of limitations bars affirmative relief against him. Talbott v. Hill, 49 App.D.C. 96, 261 F. 244; Dool v. First National Bank, 207 Cal.

347, 354, 278 P. 233, reversed on other grounds 209 Cal. 717, 290 P. 15; Tracy v. Wheeler, 15 N.D. 248, 107 N.W. 68, 6 L.R.A.,N.S., 516. And a failure to do equity need not be pleaded by the defendant "where the pleading on behalf of the plaintiff or the proof discloses the inequitable position of the plaintiffs. A court of equity may, and frequently does, refuse to entertain a party's application for relief where the facts disclose that the party seeking the relief must do, or offer to do, equity before the court in good conscience may grant him the relief sought." Dool v. First National Bank, supra (page 236). Cf. Duggan v. Platz, 263 N.Y. 505, 189 N.E. 566.

We think the Special Master and the District Court were right in disallowing appellant's claims.

Affirmed.