### 11722

CARWILE, RECEIVER, v. METROPOLITAN LIFE INS. CO.

(134 S. E., 275)

1. ASSIGNMENTS.—Payment by financial correspondent of insurance company of defaulted installments on loans, under agreement that insurance company would hold security, *held* not to constitute equitable assignment, and correspondent only acquired right to compel accounting therefor.

2. ASSIGNMENTS.—Assignment in whole or in part of chose in action with reservation of rights of collection is not an equitable assignment.

3. PRINCIPAL AND AGENT.—Insurance company, in allowing financial correspondent, who had procured real estate loans for it, to pay

defaulted installments, could reserve its rights to collect entire debt and limit its liability to the correspondent to accounting for correspondent's interest.

4. ASSIGNMENTS.—Assignee under equitable assignment may enforce his right only in Court of Equity.

5. RECEIVERS—RIGHT OF INSURANCE COMPANY TO COLLECT FULL AMOUNT ON NOTES, INCLUDING INSTALLMENTS PAID BY FINANCIAL CORRESPONDENT, WAS NOT AFFECTED BY APPOINTMENT OF RECEIVER FOR SUCH CORRESPONDENT.—Where insurance company had right to collect full amount due on notes and mortgages, including defaulted installments paid to it by its financial correspondent who had negotiated loans, such right was not destroyed by appointment of receiver for financial correspondent.

6. RECEIVERS.—Receiver can acquire no other, greater, or better interest than debtor had in property.

7. RECEIVERS.—Receiver of bond company, acting as financial correspondent of insurance company in procuring real estate loans, succeeded only to rights that bond company had because of payments made by it of defaulted installments.

8. RECEIVERS—INSURANCE COMPANY COLLECTING ENTIRE AMOUNT DUE ON NOTES, INCLUDING INSTALLMENTS PAID BY FINANCIAL CORRESPONDENT, HAD RIGHT, AS AGAINST CORRESPONDENT'S RECEIVER, TO SET OFF AMOUNT OF SUCH PAYMENTS AGAINST ITS CLAIM AGAINST CORRESPONDENT FOR OTHER NOTES COLLECTED AS FINANCIAL CORRESPONDENT.—Where bond company, acting as financial correspondent of insurance company in procuring loans, paid defaulted installments under agreement that insurance company would hold notes, insurance company, on payment of loan by debtor after appointment of receiver for bond company, had right to set off its claims against bond company for sums collected by bond company in capacity of financial correspondent.

9. RECEIVERS.—Where receiver sues on claim, existing but not matured at time of his appointment, defendant may set off debt due it from receiver's predecessor at time of appointment.

10. PLEADING.—In equity, set-off does not have to meet requirements for counterclaim under Code.

11. SET-OFF AND COUNTERCLAIM.—Absence of strict mutuality does not prevent allowance of equitable set-off where justice demands it.

12. SET-OFF AND COUNTERCLAIM.—Insolvency of party against whom set-off is claimed is sufficient ground for equitable interference.

13. RECEIVERS.—Allowance of valid set-off against insolvent company in receiver's hands *held* not to work preference in derogation of rights of general creditors.

Before WHALEY, J., Richland, January, 1924. Reversed and remanded.

Action by R. E. Carwile, as receiver of the Carolina Bond & Mortgage Company, against the Metropolitan Life Insurance Company. Judgment for plaintiff, and defendant appeals.

The decree of Judge Whaley is as follows:

"This case was heard by me without a jury, by consent of counsel, upon the pleadings and documentary evidence submitted, including the testimony of F. L. Bashore, taken by the master for Richland County, in the case of *Metropolitan Life Insurance Company v. John D. Frost.* There is no material dispute about the facts out of which this case has arisen, and those were substantially as hereinafter set forth.

"In October, 1918, the Carolina Bond & Mortgage Company, a South Carolina corporation, entered into a contract with the Metropolitan Life Insurance Company, whereby the bond and mortgage company became the financial correspondent of the life insurance company for the purpose of making loans on farm lands in the States of South Carolina and North Carolina. The plan of lending contemplated by the contract, and which was subsequently pursued, was that the bond and mortgage company should take from borrowers in those states notes or bonds in its own name, secured by mortgage upon real estate, which evidences of indebtedness were thereafter to be assigned to the life insurance company. However, among other provisions of this contract, it was provided that the bond and mortgage company should attend to the collection and remittance of the interest and principal of the loans purchased by the life insurance company, and further that, if the bond and mortgage company should advance interest or principal of any of the mortgages before collecting the same from the borrower, the right or interest which the bond and mortgage

company should have in such bonds or notes and mortgages should be subordinate to the interest therein of the life insurance company.

"Pursuant to the terms of this contract, the bond and mortgage company made a loan on the 20th of March, 1919, in the sum of $18,000 to Dr. Larkin H. Jennings of Bishopville, S. C.; the said loan being evidenced by a series of bonds or notes of Dr. Jennings, payable to the order of the bond and mortgage company, with interest before maturity at 6 per cent. and thereafter at 8 per cent. in annual installments of $1,800, on the 1st of March of each year, begining on March 1, 1921, and for 5 years consecutively thereafter, and the balance of $9,000 payable March 1, 1926, the obligation being secured by mortgage covering land in Lee County. These notes or bonds and mortgage were thereafter, in pursuance with the terms of the contract, regularly assigned to the defendant life insurance company.

"Following the deflation in the fall of 1920, Dr. Jennings, along with a great many other borrowers from the Carolina Bond & Mortgage Company, was unable, or for some reason failed, to pay the interest and installment of principal due on March 1, 1921. Under these conditions there ensued considerable correspondence and discussion between the bond and mortgage company and the life insurance company relative to the adjustment of this situation under the contract; these discussions finally terminating in a letter from the life insurance company, dated January 5, 1921, which contained the following, among other provisions:

" 'Seventh. The financial correspondent by letter to us to purchase and take over and hold as junior lien all unpaid items coming within the scope of this arrangement on December 20, 1921.'

"This proposition the bond and mortgage company accepted by letter of February 24, 1921, saying as to the seventh proposition:

" 'We hereby agree to purchase and take over and hold as junior lien all unpaid items coming within the scope of this arrangement on December 20, 1921.'

"This arrangement was formally confirmed by the life insurance company by letter dated February 26, 1921. Subsequently, and pursuant to this arrangement, on December 20, 1921, the bond and mortgage company paid to the life insurance company the installment of principal which was due by Dr. L. H. Jennings on March 1, 1921. . The life insurance company, however, retained possession of the installment of principal note or bond for $1,800, advanced by the bond and mortgage company, but there was no definite understanding or agreement as to the right of the insurance company to hold such notes, but on October 17, 1922, the life insurance company wrote the bond and mortgage company a letter in reference to such notes, saying, among other things: 'We have a number of installment notes on file in this office for which payment has been advanced by you. These will be canceled and promptly returned to your office if you will notify us of date of payment by the borrower, using the inclosed form of notice'—to which letter the bond and mortgage company made no reply. It is admitted that the life insurance company was properly advised of the advancement by the bond and mortgage company of the amount of the $1,800 note due by Dr. Jennings.

"Subsequently, owing to the death of Charles H. Barron, president of the bond and mortgage company, on November 14, 1922, and the embarrassed financial condition of the bond and mortgage company, the plaintiff, R. E. Carwile, was on November 27, 1922, duly appointed receiver of all the assets of the bond and mortgage company, with the usual powers granted to receivers for the administration of the estates of insolvent corporations for the benefit of creditors. This order appointed the plaintiff 'receiver of all and singular the moneys, choses in action, property, and

assets and effects of the said company whatsoever and wheresoever situate,' and gave him authority to collect the assets and effects of the said company and properly administer and settle its affairs.

"The receiver, thereafter, being informed that Dr. Jennings was prepared to pay up his mortgage, wrote and requested the defendant insurance company on December 8, 1922, in collecting the amount due on the mortgage, to collect and remit to him also the amount of $1,800 with interest which was payable to him as receiver of the Carolina Bond & Mortgage Company. To this letter no reply was received.

"On December 30, 1922, the insurance company returned to Mr. E. L. Craig, an attorney of Columbia, who had been temporarily employed prior to the appointment of the receiver to represent the directors of the Carolina Bond & Mortgage Company, the sum of $204.37, which was the interest of the bond and mortgage company in certain checks which had been received at the office of the bond and mortgage company and turned over by Mr. Craig to the insurance company. This sum of $204.37 Mr. Craig thereafter duly turned over to the receiver by letter dated January 2, 1923.

"On January 11, 1923, the receiver again wrote to the defendant insurance company, giving a list of the mortgages in which the bond and mortgage company had an interest by reason of certain advancements, and requesting the insurance company to collect the amounts for him and remit to him, to which letter no reply was received.

"The receiver thereafter wrote a similar letter on February 7, 1923, to the defendant insurance company, inclosing another list of papers in which the bond and mortgage company had made advancements, showing the advancement to Dr. L. H. Jennings. On this date also the receiver wrote a letter, particularly with reference to the loan to Dr. Jenn-

ings. To all of these letters the defendant insurance company sent a reply, dated February 21, 1923, signed by its general attorney, stating that, as soon as convenient, he would advise the receiver what he intended to do. However, no other letter was ever received from the insurance company. Meanwhile the defendant collected from Dr. Jennings, or his representative, the full amount due on his bonds or notes and mortgage, totaling the sum of $19,590.04, by draft on the 20th of February, 1923, including the install ment note of $1,800 due on March 1, 1921, with interest on that amount from March 1, 1921, to February 23, 1923, amounting to $281.66. On March 5, 1923, the receiver again wrote the insurance company, advising he was aware of the collection of the above amount from Dr. Jennings, and requesting that the sum of $1,800, together with the interest, be remitted to him promptly. The insurance company never replied to this letter, but subsequently, through its attorneys, advised the receiver that they expected to retain this amount to apply on a shortage account due by the bond and mortgage company to it.

"This action was thereafter rgeularly commenced by the receiver for the recovery of the amount collected by the insurance company on February 23, 1923, to wit, $2,081.60, together with interest thereon at the legal rate from date of collection, and for $750 as punitive damages for the wrongful conversion of the plaintiff's property.

"The defendant by its answer admits the substantial correctness of all essential facts set forth in the complaint, but sets up as a defense that the bond and mortgage company was indebted to the defendant in a sum exceeding $16,000 on account of collections made by the bond and mortgage company in behalf of the insurance company, which it had failed to pay over or account for. It appears from the testimony submitted on behalf of the defendant, and is admitted by the receiver, that, prior to the appoint-

ment of the receiver,. the bond and mortgage company collected from the borrowers on the bonds or notes and mortgages assigned to the insurance company the sum of $16,488.12, which it failed to account for or turn over to the insurance company, and that the estate is indebted to the insurance company to that extent. It is not claimed on behalf of the insurance company that it had any kind of legal or equitable lien upon the interest of the bond and mortgage company in the Jennings notes and mortgage, and I find from all the facts submitted to me that there was no lien of any kind on the interest of the bond and mortgage company in such papers.

"The sole question raised by this case is whether or not, under the circumstances above set forth, the collection not having been made by the insurance company until after the appointment of the receiver, while its claim against the insolvent estate had accrued before the appointment of the receiver, the principles of set-off are applicable in favor of the defendant. Under the well-settled rules of equity applying to receivers and set-off, I am clearly of the opinion that the defense set up cannot be sustained, that the principles of set-off do not apply in this case, and that the plaintiff is entitled to judgment against the defendant for the principal amount claimed, with legal interest from the date of the collection by the insurance company.

"There can be no doubt that under the contract and the letters of January 5, 1921, and February 24, 1921, the bond and mortgage company became legally entitled, upon its payment to the insurance company of the amount due by Dr. Jennings on March 1, 1921, to the note paid and to a corresponding interest in the mortgage. It is equally well settled that the receiver,. upon his appointment by the Court under the order above set forth, became in equity entitled to the rights of the bond and mortgage company in the Jennings mortgage, and was vested with the title and right

to collect that amount from the mortgagor.   23 R. C. L.,
p. 53 et seq.   *Cleveland v. McCravy*, 46 S. C., 252; 24
S. E., 175.

"While it is true that the receiver takes the assets of the
insolvent estates subject to all defenses which are available
against the insolvent estate, nevertheless this doctrine is
not applicable in this case, for the reason that this is not
a case where there was any defense available against this
chose in action which passed to the receiver.

"The doctrine of set-off is applicable in favor of the
defendant in cases of the appointment of a receiver subject
only to two qualifications: (1) The debt which is attempted
to be set off must be one which existed at the time of the
appointment of the receiver (Alderson on Receivers, pp.
779, 780; 23 R. C. L. 57) ; and (2) the relation at the time
of the appointment of the receiver between the parties must
be that of debtor and creditor.   But in this case, at the
time of the appointment of the receiver, there was no relation
of mutual debtor and creditor and no condition of mutual
debts and credits between the bond and mortgage company
and the insurance company, and no debt whatever due from
the insurance company to the bond and mortgage company.
The fact that the Jennings note, which had been paid, re-
mained in the hands of the insurance company, did not in
any wise make that company the debtor of the Carolina
Bond & Mortgage Company.   The insurance company was
the mere custodian of this note.

"The defendant contends that there were mutual debts
existing as of the time of the receiver's appointment between
the Carolina Bond & Mortgage Company and the defendant,
because the mortgage company owed it certain sums, and
that it in turn owed the mortgage company a certain note.
But the use of the word 'owe' is misleading in that connec-
tion.   The mortgage company having assigned such install-
ment note to the defendant and then by advancing the

7—S. C.—136.

necessary sum under its agreement having paid it up in full, the right to demand payment under the note reverted to the mortgage company as against the mortgagor, and so did, of course, the title to the note as a chose in action. The defendant did not in the technical sense 'owe' the mortgage company the note; it merely 'owed,' if anything, a duty to the mortgage company to deliver possession of the instrument, as such, at any time thereafter upon demand being made.   It was therefore not until the defendant received from the mortgagor the full amount of the mortgage debt that the defendant owed any amount, to wit, the amount which the mortgage company had previously advanced to take up such installment note, and at that time, the receiver having succeeded to the mortgage company's rights, such amount was owed him.   Mutuality of demands, therefore, did not arise until several months after the appointment of the plaintiff as receiver, and that is not such mutuality as can be the basis of a set-off.   Furthermore, as claimed here, one cannot by his own tortious act make himself another's debtor.

"There are other well-settled principles of law which show that the claim of the defendant in this case cannot be sustained.   Claims in order to be set off must have accrued in the same right, and, where the claims have accrued in different rights, they cannot be set off.   In this case it is obvious that the claim of the insurance company against the estate has accrued against the bond and mortgage company, while the claim against the insurance company on behalf of the receiver is one which has accrued in behalf of the receiver alone, inasmuch as the action of the defendant amounted to a tortious conversion of the property to which the receiver was legally entitled.   23 R. C. L., 57; 23 L. R. A. (N. S.), 13, and note.

"The action of the defendant in this case is tantamount to an effort on the part of a creditor of an insolvent to

secure a preference to himself by conversion of the estate and applying the proceeds to the extinguishment of his claim against the insolvent estate in full; but this will not be allowed in a Court of equity.

"In the case of *McQueen v. New,* 86 Hun., 271; 33 N. Y. S., 395, Ann. Cas., 1916-D, 599, the Court, after holding that no offset could be allowed under such circumstances, said:

" 'If such a procedure could obtain, we might easily imagine a new way to get payment for old debts. All that a creditor of an insolvent corporation, of which a receiver had been appointed, would have to do in order to procure a preference over the other creditors of the corporation, would be to take possession of the property of the corporation and convert it to his own use, and when an action was brought for its conversion, ask to offset his claim.'

"Upon like principles it is held that a creditor of a deceased will not be allowed to collect a note due to the creditor and the deceased jointly, and offset the deceased's share of the note against the amount due him by the deceased. Waterman on Set-off, 196. *Woodman v. Barker,* 2 N. H., 479. And also a bank creditor of an insolvent bank will not be allowed to collect notes in its possession due to the insolvent bank, and offset the proceeds of the notes so collected against the amount due to it by the insolvent bank. *Bank v. Suddath,* 215 U. S., 122; 30 S. Ct., 63; 24 L. Ed., 120. *Van Zandt v. Banks,* 149 F., 127.

"The defendant by its answer claims the benefit of the bankruptcy acts for the allowance of its alleged offset; but the right of offset in the bankruptcy Court is no greater than is allowed in the equity Courts in general. Cf. Collier, 1090, 1092. Nor can a creditor of a bankrupt convert the property of the bankrupt intrusted to him and offset the proceeds against the debt due him by the bankrupt. *Alvord v. Ryan,* 212 F., 83; 128 C. C. A., 539.

"The receiver in this case is the duly appointed officer of the Court to administer the estate of the insolvent for the benefit of all creditors, including this defendant. The defendant has the right to file its claim along with the other creditors and to receive whatever dividend is payable out of the estate. It has no special claim or lien upon the amount due to the receiver by Dr. Jennings. There can be no equity in allowing the defendant, who has no greater rights or security than the other creditors, to be paid in full, when the other creditors of the insolvent estate will get only a proportionate part of their claims, which are equally as valid as that of the defendant. The conduct of the defendant amounts in fact to an attempt to secure a preference over the other creditors and not to do equity among the parties concerned.

"It is therefore ordered, adjudged, and decreed that the plaintiff have judgment against the defendant for the sum of $2,081.68, with interest thereon at the legal rate from February 23, 1923, and for the costs of this action.

*Messrs. Elliott & McLain, Nelson & Mullins, Leroy A. Lincoln* and *H. C. Bates,* for appellant cite: *Conclusions drawn from agreed facts by trial Court reviewable on appeal:* 118 S. C., 52. *Legal and conventional subrogation:* 104 S. E., 464; 48 A., 333; 262 S. W., 225; 252 F., 324. *When equitable assignment complete:* 14 Wall., 69; 20 L. Ed., 762. *Equitable title will not support action in trover for conversion:* 163 Mass., 522; 40 N. E., 863; 96 So., 573; 10 N. Y. S., 272. *No conversion by defendant:* 78 S. C., 157; 59 S. E., 856. *Suit by receiver on claim not matured at time of his appointment subject to set-off of debt due defendant by receiver's predecessor at time of his appointment:* 72 A., 485; 45 A., 23; 2 A., 30; 206 N. Y., 40; 23 N. J. L., 283; 12 Gray (Mass.), 233; 135 S. W., 902; 45 S. E., 404; 21 S. E., 146; 19 S. E., 371; 146 U. S., 499; 36 L. Ed., 1059; 23 R. C. L., 56. *Receiver takes assets of insolvents*

*subject to existing equities:* 118 Ga., 345; 45 S. E., 404; 146 U. S., 499; 36 L. Ed., 1059; 23 R. C. L., 56 *Set-off and counterclaim remedial and to be liaberally applied:* 117 S. E., 415; 108 S. C., 66, 93 S. E., 422; 69 S. C., 227; 48 S. E., 61. *Allowance of set-off against receiver of insolvent does not create preference:* 136 U. S., 223; 34 L. Ed., 341; 57 Minn., 87; 47 A. S. R., 576; 141 P., 1181, L. R. A., 1915-A, 299; 23 N. J. L., 283; 45 N. W., 223; 136 N. Y., 163. *Insolvency of creditor against whom set-off claimed is ground for equitable interference:* 39 S. C., 86; 146 U. S., 499; 36 L. Ed., 1059; 45 A., 23; 136 N. Y., 163; 239 S. W., 105; 736 App. Div. (N. Y.), 495. *Absence of strict mutuality will not prevent allowance of equitable set-off:* 39 S. C., 86, Bailey Eq., 156; 146 U. S., 499; 36 L. Ed., 1059; 36 N. E., 797; 136 N. Y., 163. *Set-off allowed in analogous cases:* 155 N. Y., 401; 50 N. E., 49; 95 S. W., 337; 57 A., 1084; 55 B. W., 413.

*Messrs. Melton & Belser,* for respondent, cite: *Set-off defined:* 24 R. C. L., 792. *Set-off allowed only for obtaining equitable result:* 24 R. C. L., 805. *Set-off allowed only where demands are mutual:* 23 R. C. L., 57. *Set-off not allowed if it result in preference: Alderson on Receivers,* Sec. 576. *Set-off and counterclaim compared:* 124 S. C., 382. *When counterclaim allowed in tort action:* Code. Civ. Pro., 1922, Sec. 411. *Counterclaim of defendant arises out of different transaction:* 71 S. C., 404; 51 S. E., 240; 59 S. C., 29; 37 S. E., 20; 55 S. C., 528; 33 S. E., 787; 30 S. C., 126; 8 S. E., 796; 30 S. C., 118; 8 S. E., 639; Pomeroy's Code Remedies, Secs. 664-666. *Allowance of set-off to defendant inequitable:* 124 S. C., 380. *Analogous case hold allowance of set-off improper:* 86 Hun. (N. Y.), Ann. Cas. 1916-D, 559; 2 N. H., 479; 54 L. Ed., 120.

February 8, 1926.

The opinion of the Court was delivered by MR. JUSTICE COTHRAN.

An opinion prepared by the late Justice Fraser, concurred in generally by Justice Watts and "in result" by Justice Marion and Justice Cothran, was filed March 19, 1925, affirming the judgment of the County Court.

Wthin due time thereafter the defendant filed a petition for a rehearing, and an order was passed staying the remittitur until the further order of the Court. On account of the fact that an appeal in a similar case between the same parties was heard by this Court at the June term, 1925, the petititon for a rehearing in this case has been held in abeyance until the same matters involved in both cases could be carefully considered and determined.

It has come to this, that a majority of the Court are now of opinion that the opinion heretofore filed is erroneous, and, in view of full argument in both cases, involving the same points, it is not deemed necessary to order a reargument in this case. It is therefore ordered that the opinion heretofore filed be annulled, and that the following be substituted therefor as the judgment of this Court:

The action is for the recovery of $2,081.60, with interest from March 20, 1923, as actual damages, and $750 as punitive damages, alleged to have been sustained by the plaintiff as receiver of the Carolina Bond & Mortgage Company (hereinafter referred to as the bond company), by reason of the conversion by the defendant (hereinafter referred to as the insurance company), of certain money belonging to said receiver officially.

The facts are quite complicated and a solution of the questions of law involved requires a detailed statement of them, as follows:

Beginning in October, 1918, and continuing until November, 1922, a written contract was in force between the bond company and the insurance company, under which the bond company acted as "financial correspondent" of the insurance company in the states of North Carolina and South Carolina.

The bond company, with headquarters at Columbia, S. C., was extensively engaged in making loans upon bonds secured by real estate mortgages. The contract with the insurance company enabled it to obtain large sums of money from that company in conducting that business, and it provided in detail the manner in which the contemplated transactions were to be conducted. In brief, the bonds and mortgages were to be taken in the name of the bond company, assigned and forwarded to the insurance company with formal applications, abstracts of title, opinions, releases, etc. Upon approval of the loan, the insurance company was to deposit the amount of the loan to the credit of the bond company in a New York bank, with which the loan was consummated. Thereafter payments of installments of principal and interest were to be made by the mortgagors to the bond company, and by it remitted to the insurance company; the bond company being charged with the duty of collection and remittance.

It appears to have been contemplated that, for some reason, the bond company, in the event of failure to collect the installments of principal and interest when due, might desire to advance the payment of such defaulted installments before collecting them from the borrowers, and, to meet this contingency, the contract provided on the part of the insurance company:

"It further agrees that, if the said correspondent shall pay the interest or any part thereof, or of the principal of any mortgage to the said company, before collecting the same from the borrower, it shall advise the company when making payment that the same has been advanced by it, and any and all right, title, and interest which the correspondent may have in and to said bond or note and mortgage or deed of trust, or in the proceeds thereof, by subrogation or otherwise, shall be subordinate in all respects to the interest therein of the company."

In January, 1921, on account of the prevalent financial depression, many mortgagors had defaulted in the payment of installments upon their loans, and other defaults were expected. The bond company was anxious under the circumstances to avoid the sacrifices incident to foreclosures, by securing indulgence to such mortgagors, and on January 3, 1921, wrote to the insurance company concerning conditions and its desire. On January 5, 1921, the insurance company replied, outlining a plan of extension; the only provision pertinent to this litigation being:

"The financial correspondent by letter to us agreeing to purchase and take over and hold as junior lien all unpaid items coming within the scope of this arrangement on December 20, 1921."

The proposed plan was accepted and agreed to by the bond company on February 24, 1921, and was confirmed by the insurance company on February 26, 1921.

Among these "unpaid items," was an installment of $1,-800, due on March 1, 1921, by Dr. L. H. Jennings of Lee County, upon a loan of $18,000 previously made to him by the bond company, upon a bond and mortgage which had been duly assigned and forwarded to the insurance company, under the plan above outlined.

On December 20, 1921, in pursuance of the terms of the contract and the supplemental agreement evidenced by the correspondence referred to, the bond company remitted to the insurance company the amount of the past-due installment of the Jennings loan with interest. No formal papers appear to have been executed by the insurance company in reference to this remittance, other than an acknowledgment of its receipt.

On November 14, 1922, the president of the bond company died; on the 23d the insurance company gave formal notice of the termination of the contract of October, 1918;

on the 27th the plaintiff was appointed receiver of the bond company.

At the time of the appointment of the receiver, the bond company was indebted to the insurance company in the sum of $16,488.12, on account of installments of principal and interest collected by it upon bonds and mortgages which had been assigned to the insurance company, the bulk of which had been collected in October and November, 1922.

In February, 1923, two months after the appointment of the receiver, Dr. Jennings paid to the insurance company, by direct remittance, $19,590.68, the total amount unpaid upon his bond and mortgage, which included the installment of March 1, 1921, advanced by the bond company on December 20, 1921—$1,800, with $281.60 interest, total $2,081.60.

The receiver of the bond company thereafter made demand upon the insurance company for this amount, and, upon refusal, this action was instituted on August 10, 1923.

The defense of the insurance company was that it had the right to set off its claim of $16,488.12 against this demand of the receiver.

The case was tried by his Honor, Judge Whaley, County Judge, without a jury, by consent. He filed a decree refusing to allow the set-off claimed by the defendant, and rendering judgment in favor of the receiver for $2,081.68, with interest from February 23, 1923. From this judgment the insurance company has appealed.

It appears that the insurance company has in its hands about $40,000 of these advance payments made by the bond company, including that involved herein, and whether it shall be allowed to offset against this liability the amount due by the bond company to it, $16,488.12, is a matter of serious consequence to it, determinable by the result of this litigation. If it be not allowed to do so, the insurance company will be required to pay this $40,000 to the receiver

and receive a dividend, estimated at 10 to 15 per cent. upon the amount concededly due by the bond company to it; a result which appears to me unjust and not to be tolerated, unless irresistibly compelled by the principles of the law.

The availability of the defendant's asserted claim of setoff is determined by the character and extent of the interest or right which the bond company acquired in the Jennings bond and mortgage, by reason of its advance payment, and not by the accidental fact that the payment by Dr. Jennings was made to the insurance company after the appointment of the receiver.

Under the original contract of October, 1918, it was entirely optional with the bond company whether it would make any advance payment of these defaulted installments; if it did so, the contract provided that whatever right it might acquire by such advance payment should be subordinate in all respects to the interest of the insurance company. By the supplemental agreement, evidenced by the correspondence referred to, the bond company became obligated to purchase and take over all unpaid items of interest and installments of principal, up to December 20, 1921, and hold them as liens junior to the liens of the insurance company. The payment by the bond company of the Jennings installment of $1,800, due March 1, 1921, was made under the conditions and in pursuance of the obligation of the supplemental agreement referred to. The effect of it was a purchase by the bond company of an interest in the Jennings debt, equal to the advance payment made, and has the same force and effect as if the insurance company had formally assigned so much of the debt to the bond company, subject to the agreed priority of the insurance company; in other words, it amounted at most to a partial assignment of a chose in action.

Under ordinary circumstances, the transaction would have constituted an equitable assignment of so much of the bond

and mortgage as was equal to the advance payment. But, under the peculiar circumstances of this transaction, the essential elements of an equitable assignment are lacking.

The bond and mortgage remained in the possession of the insurance company; the title to them was in that company; the right, the exclusive right, to enforce collection was in that company; Jennings could not have paid the bond company its part of the debt and secured an acquittance, nor could he have been compelled at the suit of the bond company to have paid such part to it. I think, therefore, that the payment did not constitute an equitable assignment, and that the only right which the bond company acquired was to compel an accounting by the insurance company, as the trustee of an express trust, for its conduct in reference to the subject of the trust. In other words, the insurance company occupied the position of a trustee to hold the entire debt, to use proper diligence in collecting it, and to account to the bond company for its equitable interest.

That the insurance company reserved the right to the custody of the securities and the right to collect the entire amount of the mortgage debt does not admit of a doubt. In April, 1921, following the consummation of the supplementary agreement, the insurance company notified the bond company that it intended to hold the securities and the notes representing the advance payments, until payment by the mortgagors, then cancel them and return them to the bond company. No objection to this suggestion was entered by the bond company. The advancement upon the Jennings note was made in December, 1921, by the bond company, without a demand for the installment note then being paid and no dissent from the expressed purpose of the insurance company to hold all such notes until payment. Nearly a year later, in October, 1922, the insurance company called the bond company's attention to the fact that it was holding such notes, and reminding it that it was ready to cancel and

return any notes on which payment had been made by the mortgagors; not to remit the money to the bond company, but to return the canceled notes; inferentially to hold the proceeds to the credit of the bond company subject to an accounting between them. No protest against this method was suggested by the bond company. •It is clear therefore that there was a definite understanding and agreement as to the right of the insurance company to hold these evidences of debt, the notes representing the advance payments made by the bond company, and to collect the full amounts due upon the mortgages, accounting to the bond company for its proportion thereof, established by oral and written agreements and by the practice of the parties. It appears that, prior to the appointment of a receiver, the bond company had advanced upon deferred payments about $40,000, and that in no instance did the bond company demur to the right of the insurance company to hold the installment notes representing these advances until paid by the mortgagors to the insurance company. This right of the insurance company was distinctly recognized by the receiver in his letter of February 7, 1923:

"I, as receiver, have been informed that these advancements were made to your company with the understanding that you would collect from the mortgagor and return the amounts advanced to the said Carolina Bond & Mortgage Company."

It has been uniformly held that, where the holder of a chose in action assigns it in whole or in part and reserves the right to collect the chose in action, whatever the transaction may be it is not an equitable assignment.

In 5 C. J., 912, it is said:

"The assignor of a chose in action must part with the power of control over the thing assigned; if he retains control, it is fatal to the claim of the assignee."

Referring to equitable assignments, it is said in *Christmas v. Russell,* 14 Wall., 69; 20 L. Ed., 762:

"The assignor must retain any control over the fund—any authority to collect, or any power of revocation. If he do, it is fatal to the claim of the assignee."

"An assignor of a chose in action must part with the power of control over the chose assigned, and the assignment must be so delivered as to be irrevocable." *Coffman v. Liggett,* 107 Va., 418; 59 S. E., 392.

"Where the supposed assignor retains the subject under his own control by delivering the order, not to the assignee but to his own agent, the transaction is not allowed to have the effect of an equitable assignment." 2 Am. & Eng. Enc. L., 1061.

In the case of *In re* Wood, 243 Pa., 211; 89 A., 975, it was held that an agreement under which the alleged assignor retains any control over the fund, authority to collect, or power of revocation, does not constitute an equitable assignment of a fund in the hands of executors.

Another reason why the transaction in question did not amount to an equitable assignment is that the fund holder, Dr. Jennings, could not have safely paid the amount of his debt represented by the advance payment, to the bond company, and could not have been compelled by the bond company to do so.

The insurance company, in allowing the bond company, for its own purposes, to make the advance payment, certainly had the right to stipulate that its right to collect the entire debt be reserved; that the bond company should not acquire a lien upon the bond and mortgage or upon the proceeds of collection; that its liability to the bond company should simply be the duty of accounting to it for the equitable interest acquired, doubtless to meet the very situation that has been presented to secure the right of set-off. If, therefore, the insurance company retained the

exclusive right of collection, the bond company did not have it. Not having it, the bond company could not have compelled Dr. Jennings to pay its part of the debt, and Dr. Jennings would not have been safe in doing so.

In *Christmas v. Russell*, 14 Wall., 69; 20 L. Ed., 762, *supra*, it is said:

"The transfer must be of such a character that the fund holder can safely pay, and is compellable to do so, though forbidden by the assignor."

"But a mere promise or agreement to pay a debt out of a designated fund, when received, does not givt an equitable lien upon the fund, or operate as an equitable assignment of it. Something more is necessary. To constitute an equitable assignment, there must be an assignment or transfer of the fund, or some definite portion of it, so that the person owing the debt or holding the fund on which the order is drawn can safely pay the order, and is compellable to do so, though forbidden by the drawer." *Hicks v. Roanoke Co.*, 94 Va., 741; 27 S. E., 596.

"It is well settled that an order to pay a debt out of a particular fund belonging to the debtor gives to the creditor a specific equitable lien upon the fund, and binds it in the hands of the drawee. A part of the particular fund may be assigned by an order, and the payee may enforce payment of the amount against the drawee. But a mere agreement to pay out of such is not sufficient. Something more is necessary. There must be an appropriation of the fund *pro tanto*, either by giving an order or by transferring it otherwise in such a manner that the holder is authorized to pay the amount directly to the creditor without the further intervention of the debtor." *Trist v. Child*, 21 Wall. 441; 22 L. Ed., 623.

Under these authorities the assignee of the entire chose in action is not the holder of an equitable assignment if the assignor reserve the right of collecting it. *A fortiori*

is the assignee of a part of the chose in action under a greater disability.

"An assignment of a portion of a debt, assigned without the consent or ratification of the debtor, cannot be recovered on the portion so assigned, and this principle is of force in equity as well as at law." *Burnett v. Crandall,* 63 Mo., 410.

"An assignment of a portion of a debt does not vest the assignee with any greater right than the assignor himself had, and, as the assignor could not himself institute an action to recover part of the amount, his assignee cannot." *Weinstock v. Bellwood,* 12 Bush. (Ky.), 139.

"A partial assignment of one's interest in a fund in the hands of another is not binding on the latter, unless accepted by him; and he may deal with the assignors as if no assignment had been made, in the absence of the institution of a suit to which all persons interested are parties." *Shearer v. Shearer,* 137 Ga., 51; 72 S. E., 428.

"As between an assignee and a debtor, a partial assignment cannot be enforced." *Burditt v. Porter,* 63 Vt., 296; 21 A., 955; 25 Am. St. Rep., 763.

"A partial assignment of a debt so as to authorize the assignee to recover thereon cannot be made without the consent or ratification of the debtor." *Hughes v. Kiddell,* 2 Bay (S. C.), 324.

But assume that, notwithstanding these difficulties, the assignment of a part of the chose in action may constitute an equitable assignment, the assignee's right, being equitable, is enforceable only in a Court of equity.

"While a single debt may be partially assigned to one or more assignees, such assignees can sue only in a Court of equity, which can adjudge the rights of all parties in one action." *Carvill v. Mirror Films,* 178 App. Div., 644; 165 N. Y. S., 676.

In 5 C. J., 894, it is said:

"At law a partial assignment of a chose in action is not recognized unless made with the consent of ratification of the debtor. Courts of equity, however, have always recognized partial assignments of choses in action for many purposes, and will protect the assignees under such partial asssignments whenever they can do so without working a hardship upon the debtor." .

The reason of the rule is that a creditor is not permitted to split up a single cause of action into many actions, without the consent of his debtor, and thus subject him to annoyance and embarrassment not contemplated by his original contract.

In *Fourth St. Nat. Bank v. Yardley,* 165 U. S., 634; 17 S. Ct., 439; 41 L. Ed., 855, the Court said:

"The owner of a chose in action or of property in the custody of another may assign a part of such rights, and that an assignment of this nature, if made, will be enforced in equity, is also settled doctrine of this Court."

In *James v. Newton,* 142 Mass., 368; 8 N. E., 122; 56 Am. Rep., 692, cited in the *Yardley case,* it is held that in equity there may be, without the consent of the debtor, an effectual assignment of part of an entire debt.

"The rule is well settled that only a Court of equity can enforce a partial assignment of a fund when the debtor has not assented to the assignment." *Timmons v. Bank,* 11 Ga. App., 69; 74 S. E., 798.

"But the settled rule of the national Courts and the general and rational rule is that the assignee of a part of a credit or of a chose in action or of property in the custody of another may enforce his claim by a suit in equity, for the very reasons that he cannot do so, and hence has no adequate remedy, at law, and that he may make the assignor and all the assignees parties to the suit, so that the debtor will be subject to but a single action"—citing cases. *Rogers v. Penobscot Co.,* 83 C. C. A., 380; 154 F., 606.

I do not think that there can be a doubt, therefore, as to the proposition that the only right acquired by the bond company, on account of its advance payment, was to compel an accounting by the insurance company of its equitable interest.

But in this particular case, concerned as we are with the availability of the asserted claim of set-off, it makes very little difference whether the payment of the defaulted installment created an equitable assignment, an equitable right to an accounting, or an equitable right in the bond company as the assignee of a part of a chose in action; for, in any event under any construction of the effect of the transaction, the bond company must have asserted its right in a Court of equity. If so, the bond company did not acquire the legal title to a chose in action or to any part of it, and the acquisition of the receiver is limited to that of the bond company. If the receiver did not acquire the legal title to a chose in action, in whole or in part, he succeeded only to the equitable rights of the bond company.

In *Carroll v. Cash Mills,* 125 S. C., 332; 118 S. E., 290, it is declared:

"It hardly needs authority for the proposition that the receiver is in no sense a subsequent purchaser or creditor, but stands in the shoes of the debtor, with no greater title or interest than he possessed"—citing cases.

See *In re* Amercian Co., 125 S. C., 214; 118 S. E., 303.

Whether the collection of the entire Jennings debt was made before or after the appointment of the receiver, the insurance company would have done no more than it had the right to do under its contract with the bond company.

As the title to the securities was in the insurance company, and the rights to collect the whole amount due, regardless of the advance payment, was vested, by agreement and express reservation, in the insurance company, I apprehend that there could arise no controversy as

8—S. C.—136.

to the right of the insurance company to make that collection before the appointment of the receiver. It was a right which continued certainly up to the moment of the receiver's appointment; a right which the bond company was compelled to recognize. Was this right destroyed by the appointment of a receiver? As quoted from 34 Cyc., 191, in the case of *In re* American ·Slicing Machine Co., 125 S. C., 214; 118 S. E., 303:

"A receiver can acquire no other, greater, or better interest than the debtor had in the property."

And in *Carroll v. Cash Mills,* 125 S. C., 332; 118 S. E., 290, it is declared:

"The appointment of a receiver works no metamorphosis in the title or interest to or in the assets of the insolvent; that the receiver takes possession of them as the arm of the Court, subject to all existing liens and incumbrances, to be administered under the direction of the Court having due regard to the legal and equitable rights of the parties and those stockholders and creditors represented by the receiver."

"A receiver holds the property coming into his hands by the same right and title as the person for whose property he is receiver, subject to liens, priorities, and equities existing at the time of his appointment. He becomes merely the assignee of the insolvent and has exactly the same rights." 23 R. C. L., 56, citing cases.

"The receiver took the assets of the Fidelity Bank as a mere trustee for creditors, and not for value and without notice, and, in the absence of statute to the contrary, subject to all claims and defenses that might have been interposed as against the insolvent corporation. * * * " *Scott v. Armstrong,* 146 U. S., 499; 13 S. Ct., 148; 36 L. Ed., 1059.

The receiver makes no claim that he has created a new right against the insurance company or that a new right has inured to him since his appointment. He has done nothing and the insurance company has done

nothing which by any possibility could be construed into the creation of a new cause of action in favor of the receiver. All that has been done is the collection of the entire debt from Jennings, including the advance payment, a right Jennings debt, subject of course to accountability to the bond company, and which the receiver, standing in the shoes of the bond company, could not deprive it of. Consequently the right upon which the receiver sues, the right to require an accounting, is a right which was vested in the bond company and which succeeded to him as receiver. It follows, therefore, that, if the insurance company had the right, before the appointment of a receiver, to collect the entire Jennings debt, subject of course to accountability to the bond company, that right was not affected by the appointment, and that the receiver succeeded only to the rights which the bond company may have asserted, and subject to all defenses against it.

Now the question arises whether the insurance company, in the event of the collection before receivership and an action by the bond company for an accounting, could have set off the debt which the bond company owed it against the debt which it owed the bond company. If so, it has the same right as against the receiver upon collection after his appointment. Upon this proposition I do not think that there can be room for controversy even. The bond company was under a contract duty to collect the installments of principal and interest as they fell due, and to remit them to the insurance company. This clearly established a trust relation between them, and the moment a collection was made the bond company became a trustee for the insurance company. In like manner the insurance company was under a contract duty to collect the entire mortgage debts and to account to the bond company for its interest in them. This clearly established a trust relation between them, and the moment a collection was made

the insurance company became a trustee for the bond company. Both of these relations spring from the same contract, and present a perfect illustration of the right of recoupment in equity, which entitles the one party to set off against the claim of the other that which such other owes to him.

"The doctrine of recoupment rests upon the principle that it is just and equitable to settle in one action, thus avoiding a multiplicity of suits, all claims growing out of the same contract or transaction." 3 Story, Eq. Jur. (14th Ed.), § 1878.

This doctrine grows out of the inherent power of a Court of equity to do justice between the parties and in avoidance of a multiplicity of suits. It operates only by way of abatement of the claim against which it is opposed, and does not entitle the party asserting it to a judgment for any difference as a counterclaim would. 34 Cyc., 623.

The objection is raised that the obligation of the insurance company to account did not arise until after the receiver was appointed, the collection not having been made by the insurance company until after such appointment, that the cause of action was then created in the receiver, and that consequently there was no mutuality in the demands.

As I have endeavored to show, the fact of collection after the appointment does not make a particle of difference, for the reason that the right to collect was vested in the insurance company by the contract; it was binding upon the bond company and upon the receiver; and the collection after the appointment was referable to the original contract right.

It is well settled that, where a receiver sues on a claim or in a right existing, but not mature, at the time of his appointment, the defendant may set off a debt due it from the receiver's predecessor at the time of his appointment. *Colton v. Drover Perpetual Building & Loan Ass'n*, 90 Md., 85; 45 A., 23; 46 L. R. A., 388; 78

Am. St. Rep., 431. *Building and Engineering Co. v. Northern Bank,* 206 N. Y., 400; 99 N. E., 1044. *Van Wagoner v. Paterson Gas Light Co.,* 23 N. J. Law, 283. *Steelman v. Atchley,* 98 Ark., 294; 135 S. W., 902; 32 L. R. A. (N. S.), 1060. *Davis v. Industrial Mfg. Co.,* 114 N. C., 321; 19 S. E., 371; 23 L. R. A., 322. *Skiles v. Houston,* 110 Pa., 254; 2 A., 30. *Scott v. Armstrong,* 146 U. S., 499; 13 S. Ct., 148; 36 L. Ed., 1059. Thus the alleged fact that the claim on which the receiver sues did not mature until after his appointment does not prevent the set-off by the insurance company of its debts from the bonding company admittedly due at the time of his appointment, for any lack of mutuality.

Even if there were a question of mutuality of the demands, it is well recognized that in equity a set-off does not have to meet the requirements for a counterclaim under the Code. *Falconer v. Powe,* Bailey Eq. 156. *North Chicago Rolling Mill v. St. Louis Steel Co.,* 152 U. S., 596; 14 S. Ct., 710; 38 L. Ed., 565. *Smith v. Perry,* 197 Mo., 438; 95 S. W., 337.

In *North Chicago Rolling Mill v. St. Louis Steel Co., supra,* it is said: But the defendant's claim, while not good in law may still be entitled to recognition as an offset in equity; "cross-demands and counterclaims, whether arising out of the same or wholly disconnected transactions, and whether liquidated or unliquidated, may be enforced by way of set-off whenever the circumstances are such as to warrant the interference of equity to prevent wrong and injustice."

And in *Smith v. Perry, supra,* the Court says:

"But it does not necessarily follow that, because defendant's claims could not be pleaded as set-offs under the Statute, they cannot be pleaded as set-offs in a proceeding in equity; the right to do so depending upon the circumstances, among which is the insolvency of the party against whom the set-

off is claimed, this being distinct ground for entertaining it. * * *"

The Courts have uniformly applied the principle of equitable set-off with great liberality to prevent injustice even in cases where elements requisite to legal set-off have been lacking. The facts indicating the injustice of denying the insurance company a set-off in the present case have been sufficiently presented. These facts warrant the allowance of a set-off, even if it should be conceded, as it is not, that there was no strict mutuality of demands. The Courts have repeatedly held that the absence of strict mutuality does not prevent the allowance of an equitable set-off, where justice demands it. *Falconer v. Powe,* Bailey Eq. 156. *Edwards v. Williams,* 39 S. C., 86; 17 S. E., 457. *Scott v. Armstrong,* 146 U. S., 499; 13 S. Ct., 148; 36 L. Ed., 1059. *Merrill v. Cape Ann Granite Co.,* 161 Mass., 212; 36 N. E., 797; 23 L. R. A. 313. *Hughitt v. Hayes,* 136 N. Y., 163; 32 N. E., 706.

In addition to the plain equity of the insurance company, under ordinary circumstances, to set off its claim against the claim of the receiver, in considering the relative equities, the very fact of insolvency of a creditor against whom a set-off is claimed creates an equity permitting the set-off. As said by the Supreme Court of the United States in *North Chicago R. M. Co. v. St. Louis O. & S. Co.,* 152 U. S., 596; 14 Ct., 710; 38 L. Ed., 656:

"By the decided weight of authority it is settled that the insolvency of the party against whom the set-off is claimed is a sufficient ground for equitable interference"—citing case.

See, also, *Edwards v. Williams,* 39 S. C., 86; 17 S. E., 457. *Scott v. Armstrong,* 146 U. S., 499; 13 S. Ct., 148; 36 L. Ed., 1059. *Colton v. Drover's Perpetual Building & Loan Ass'n,* 90 Md., 85; 45 A., 23; 46 L. R. A., 388; 78 Am. St. Rep., 431. *Hughitt v. Hayes,* 136 N. Y., 163; 32 N. E., 706. *State v. Allen,* 292 Mo., 360; 239 S. W., 105.

*Wyckoff v. Williams,* 136 App. Div., 495; 121 N. Y. S., 189. *St. Paul Co. v. Leck,* 57 Minn., 87; 58 N. W., 826; 47 Am. St. Rep., 576.

In the *Scott case,* it is said:

"Courts of equity frequently deviate from the strict rule of mutuality when the justice of the particular case requires it, and the ordinary rule is that, where the mutual obligations have grown out of the same transaction, insolvency on the one hand justifies the set-off of the debt due upon the other."

The suggestion that the allowance of the set-off will work a preference in favor of the insurance company in derogation of the rights of general creditors is fully answered by the Supreme Court of the United States in *Scott v. Armstrong,* 146 U. S., 499; 13 S. Ct., 148; 36 L. Ed., 1059:

"Where a set-off is otherwise valid, it is not perceived how its allowance can be considered a preferene and it is clear that it is only the balance, if any, after the set-off is deducted, which can justly be held to form part of the assets of the insolvent. The requirement as to ratable dividends, is to make them from what belongs to the bank, and that which at the time of the insolvency belongs of right to the debtor does not belong to the bank."

See *Union Bank v. Bank,* 136 U. S., 223; 10 S. Ct., 1013; 23 L. Ed., 341. *Trust Co. v. Leck,* 57 Minn., 87; 58 N. W., 826; 47 Am. St. Rep., 576. *People v. California Safe Deposit & Trust Co.,* 168 Cal., 241; 141 P., 1181, L. R. A., 1915-A, 299. *Van Wagoner v. Paterson Gaslight Co.,* 23 N. J. Law, 283. *McLauren v. Bank,* 76 Wis., 259; 45 N. W., 223.

The judgment of this Court is that the judgment of the County Court be reversed, and that the case be remanded to that Court for such proceedings as may be necessary to carry into effect the conclusions herein announced.

Mr. Justice Marion and Mr. Acting Associate Justice Purdy concur.

Mr. Chief Justice Gary did not participate.

Justice Watts (dissenting) : The following opinion was prepared by the late Justice Fraser, and is adopted by me:

There is only one question that needs consideration in this case, to wit, May the appellant offset against the claim of the respondent a debt owed to appellant by the bond company?

This is an action at law, tried before the Hon. M. S. Whaley, Judge of the County Court for Richland County, without a jury. The facts, therefore, as found by Judge Whaley, are the facts in this case, as this Court has no jurisdiction to review the findings of fact in a law case, unless there is no evidence to sustain such findings. There is in this case evidence to sustain the findings of Judge Whaley.

The Carolina Bond & Mortgage Company agreed to assist the Metropolitan Life Insurance Company in making loans on farm lands in North and South Carolna. There was a written contract, rather elaborate, in which it was agreed that the bond company should make loans, and take the notes or bonds and mortgages therefor in its own name and assign them, without recourse, to the insurance company. The contract provided:

"It further agrees that, if the said correspondent shall pay the interest or any part thereof, or of the principal of any mortgage to the said company before collecting the same from the borrower, it shall advise the company, when making payment, that the same has been advanced by it, and any and all right, title, and interest which the correspondent may have in and to said bond or note and mortgage or deed of trust, or in the proceeds thereof, by subrogation or otherwise, shall be subordinate in all respects to the interest therein of the company."

A loan was made to. Dr. Jennings for $18,000, payable in installments of $1,800 a year. The installment due March 1, 1921, was delayed, and the payment was advanced under the contract by the bond company. The bond company became insolvent, and in February, 1923, Dr. Jennings paid his debt in full to the insurance company, including the payment due March 1, 1921, which had been advanced by the bond company.

Mr. Carwile was appointed receiver December 27, 1922. The insurance company contends that there was a subsequent contract by which the insurance company was to hold notes upon which the bond company had paid the installment notes or bonds as security for any balance that the bond company might owe to the insurance company. Judge Whaley held that there was no such contract, and that the insurance company held the note or bond merely as custodian for the bond company.

The insurance company collected from Dr. Jennings, in February, 1923, about two months after the appointment of the receiver, the entire amount of his indebtedness, including the amount of money that had already been advanced by the bond company.

Now, if the insurance company did hold, as a matter of fact, the note or bond as custodian for the bond company, it must of necessity have collected it as the agent of the receiver. From the facts as found by Judge Whaley, it followed inevitably that the collection was on behalf of the receiver and must be paid to him without offset.

For a full statement of the facts, see the decree of Judge Whaley, which should be reported.

The judgment appealed from should be affirmed.