L. A. ANDREW, Superintendent of Banking, Plaintiff, v. UNION SAVINGS BANK & TRUST COMPANY, Defendant, D. W. BATES, Superintendent of Banking, Receiver, Defendant, Appellant, A. M. COMPTON et al., Defendants, Appellees.

No. 44413.

November 15, 1938.

Rehearing Denied March 17, 1939.

Cook & Balluff, for appellant.

Realff Ottesen, for appellees.

Hamilton, J.—The facts out of which this proceeding arose are as follows: Previous to the closing of the bank and the appointment of the receiver, which occurred on December 28, 1932, appellees had borrowed money of the bank on their promissory notes in a sum in excess of $35,000. These notes with other items of credit had been pledged by the bank to the Reconstruction Finance Corporation as collateral to what is designated in the record as Loan No. 3. Appellees were also depositors of the bank having on deposit, at the time it closed, approximately $3,000. Notwithstanding the fact that their notes were not due, appellees, "not knowing what would happen with the personnel or policy of the Reconstruction Finance Corporation with the bank in the condition it was" and feeling that "it would be more secure in having the indebtedness in the hands of a permanent lending organization," talked over, with the examiner in charge and also with a representative of the Reconstruction Finance Corporation, the matter of payment of their notes, and, also, inquired as to their right to set-off of their deposit account against the indebtedness on the notes. They were told that the money would be accepted although not yet due but no set-off could be allowed or was allowable because the notes were pledged as collateral. Assuming this was correct, appellees voluntarily paid the notes on August 25, 1934. No formal demand for set-off was made. It seems that, by special agreement with the Reconstruction Finance Corporation, set-offs were allowed as to all notes pledged with Loan No. 8, being the last loan negotiated to secure which all the then remaining assets of the bank "includ-

ing the inkwells'' were pledged. It also appears from the evidence that, by special arrangement with the Reconstruction Finance Corporation, beginning May, 1937, it then appearing from a reappraisal that there was a substantial equity in the collateral and that the Reconstruction Finance Corporation could safely permit set-offs without prejudicing its position as lender, the right of set-off was recognized and allowed to depositor-borrowers whose notes had not previously been paid. Appellees' notes not being included in the list of notes pledged to Loan No.8 and having been paid before May, 1937, were not within the bounds of either of the aforesaid special arrangements relating to the allowance of set-off.

On June 22, 1937, appellees filed application in the receivership in which it is alleged that payment of their notes was made because of the representation, relied upon by them, made by the examiner in charge that they were not and would not be entitled to set-off because their notes and mortgage had been pledged as collateral and the terms of the assignment were such that no set-off could or would be allowed; that in truth and in fact there was an equity in the mortgage and notes pledged and claimants were then and there entitled to a set-off; that prior to and at the time of the making of the aforesaid representations the receiver had allowed and was allowing set-offs to persons whose relation to the Union Savings Bank and Trust Company and to the receiver was exactly the same as that of the claimants all of which facts were then unknown to the claimants; and that claimants are entitled to credit for the amount of the balance of their deposit accounts as money mistakenly paid. Wherefore, they ask that the receiver be directed to pay the sum of $2,368.97, the balance in their deposit accounts, as money heretofore paid under mistake of fact and by reason of representations, made by said receiver and his agents, which were not true.

The answer consists of a general denial, subject to certain admissions, together with affirmative allegations to the effect that at no time prior to the date of payment of their notes did appellees demand of the receiver the right to set-off their deposit claims against the indebtedness formerly held by the bank; the fact that the notes were pledged to the Reconstruction Finance Corporation prior to the appointment of the receiver and that, by reason of such facts, receiver was never in a position to allow set-offs against said notes of the deposit claim; that payment by

petitioners of the notes was voluntary and without demand on the receiver for set-off and petitioners thereby waived and abandoned any right to set-off which they may or might have been entitled to and are, therefore, now estopped to assert claim for set-off.

The trial court found that the equities were with the applicants; that the applicants paid an amount in excess of what was then owing by them to the receiver, by reason of representations made to them, by the examiner in charge, that they were were not entitled to set-off; and that the amount due from the receiver to applicants, being the amount of their deposits in the bank, should have been allowed as offset and that such sum should be returned to the applicants as money heretofore wrongfully paid to the receiver under mistake of fact. Judgment was entered accordingly from which order and judgment receiver has appealed.

We will have occasion to enlarge upon the foregoing statement as we proceed with the discussion of the legal questions involved. As a background for their argument in support of judgment below, appellees call attention to the following legal principles relating to the right of set-off:

"It is fundamental that in insolvency proceedings the question of offset is purely a question of equity, and the general statutes of counterclaim and offset, unless specially made to apply to insolvency, have no bearing on the question." Parker v. Schultz, 219 Iowa 100, 101, 257 N. W. 570, 571.

"That doctrine (of equitable set-off) is a rule of equity, and is applied quite independently of the limitations, which attach to a so-called legal or statutory offset. The equitable rule has its most frequent application, as against an insolvent who is both a creditor and a debtor to his adversary. The reason for the rule is succinctly stated in the following quotation and subquotation from Brown v. Sheldon State Bank, 139 Iowa 83, 89, 117 N. W. 289, 291:

" 'It is the rule in this state, as it is in many other jurisdictions, to allow set-off where parties are mutually indebted and one becomes insolvent. And it is not material that the indebtedness, sought to be cancelled by offset, is not due at the time. Thomas v. [Exchange] Bank, 99 Iowa 202, 68 N. W. 780, 35 L. R. A. 379; Wikel v. Garrison, 82 Iowa 453, 48 N. W. 803;

Swentzel v. Bank, 147 Pa. 140, 23 A. [405], 415, 15 L. R. A. 310, 30 Am. St. Rep. 718; Thompson v. Trust Co., 130 Mich. 508, 90 N. W. 294, 97 Am. St. Rep. 494; Davis v. Mfg. Co., 114 N. C. 321, 19 S. E. 371, 23 L. R. A. 322; North Chicago Co. v. St. Louis Co., 152 U. S. 596, 14 S. Ct. 710, 38 L. Ed. 565; Van Wagoner v. Gaslight Co., 23 N. J. Law [283] 294. The case last cited involved a bank failure, and it was said: ''In cases of cross-indebtedness the assets of the bank consist only of the balance of the accounts. That is all the fund which the bank itself would have had to satisfy its creditors in case no receiver had been appointed. And there is no equality, and no equity, in putting a debtor of the bank, who has a just and legal set-off as against the corporation, in a worse position, and the creditors in a better position, by the failure of the bank and the appointment of a receiver.'' ' '' Andrew v. Dundee Savings Bank, 216 Iowa 240, 249 N. W. 154, 93 A. L. R. 1156.

''It is a well-known principle of equity that in these receivership matters the rights of all parties are to be determined as of the date of the appointment of the receiver.'' Andrew v. American Savings Bank and Trust Co., 217 Iowa 657, 661, 251 N. W. 48.

''Equality is equity.'' Maxim.

''A receiver is a ministerial officer of the court, or, as he is sometimes called, the hand or arm of the court. He stands in an indifferent attitude, not representing the plaintiff or the defendant, but really representing the court, and acting under its direction, for the benefit of all parties and interests. He is a quasi-trustee holding the fund for the benefit of whoever may eventually establish title thereto. His acts and possessions are the acts and possessions of the court. * * * His authority is derived solely from the court appointing him and he is subject to its order only.'' 23 Ruling Case Law, page 7.

Where money is paid by reason of mutual mistake of fact it is a fundamental principle of law that courts will grant relief. Fidelity Savings Bank v. Reeder, 142 Iowa 373, 120 N. W. 1029; Shoenhair v. Merrill, 165 Iowa 384, 145 N. W. 919.

'' 'The general rule denying recovery of payments paid under a mistake of law does not apply to payments to an office of the court.' '' Morgan v. Jasper County, 223 Iowa 1044, 1046, 274 N. W. 310, 311; 111 A. L. R. 634, 637.

Appellees also contend that in case a right of offset has been denied through error, a court of equity will correct that error if there is some principle of law or equity permitting it and they cite in support of this statement, Receiver of Am. Sav. Bk. of Carroll v. Carroll Country Club, 218 Iowa 489, 255 N. W. 871; Leach v. City-Commercial Sav. Bk., 207 Iowa 1254, 219 N. W. 496; Grant v. Buckner, 172 U. S. 232, 19 S. Ct. 163, 43 L. Ed. 430.

With the foregoing legal principles in the background, appellees make the claim that the facts in this case show that they did not know the true facts concerning the right of set-off, and, therefore, the payment was made by them, at least, under mistake of fact. They also state that there is no intention to impute any wrong to the receiver or his examiner in charge in their representations made to the claimants that they were not entitled to set-off but certainly the receiver was at least mistaken because his treatment of all other parties in the same status as the claimants required a predetermination on his part of the necessary facts to support granted right of set-off.

We have carefully read appellees' argument. It is not very clearly pointed out by appellees just what they mean when they say claimants did not know the ''true facts''. The true facts were that appellees' notes had been pledged as collateral before the bank went into receivership. This they knew. They also knew and were bound to know that under the law where commercial paper is rediscounted or put up as collateral the holder is a bona-fide holder in due course and the plea of set-off is not available against such holder. They knew and were bound to know that since the notes were held as collateral by the Reconstruction Finance Corporation they would not be available to the receiver for use as an offset against appellees' deposit in the bank. It is true they did not know about the special arrangement for allowing set-offs as to notes listed as collateral to Loan No. 8, but lack of such knowledge was in no way material in determining the rights and obligations of appellees since their notes were not included in the list mentioned. The legal effect of this concession to allow set-offs as to items listed as collateral to Loan No. 8 was to waive its claim or right in so much only of the proceeds from the collection of collateral notes as equaled the amount of the offsets allowed. The import of appellees' contention as applied to this proposition is that because all collateral was over-lapping

the above waiver would include their notes. To so hold would be tantamount to holding that a special waiver as to one list of notes pledged as collateral was a waiver as to all other lists and no such holding would be warranted under the facts. It is also true that appellees did not know that at some time in the future the value of the collateral would be found to be such that the receiver would be able to obtain additional waivers permitting set-offs as to all notes pledged which had not been previously paid. This was a fact which was not known and perhaps was beyond the possibility of ascertainment, at the time the appellees talked the matter over with the receiver before paying their notes. The receiver was not a prophet and it would be unjust and unfair to such receiver and to the record of his testimony to find as a conclusion of fact that he ever stated, as a fact, as of his own knowledge, that there never would be a time in the future when conditions might arise under which persons, who had not yet paid their notes, might be able to obtain the benefit of the right of set-off of their deposit accounts against their indebtedness. Mr. Compton, in his testimony, does not attempt to give the exact language that was used by the receiver. In his direct testimony, Mr. Compton said:

"Mr. McCulloch stated *in substance* that the paper had been pledged with the Reconstruction Finance Corporation and that no offset privilege could be considered or applied." And on cross-examination, he states:

"I discussed it briefly with Mr. McCulloch the last time I talked with him and was told that there was nothing *in sight nor probably* with respect to offset." At another place, he testified:

"I was given to understand as I had been every few weeks after the bank closed that offsets were out of the picture. * * * that was *the opinion* that I had been given uniformly by people within the organization and by Mr. Townsend. * * * "(Italics ours.)

It is also true that they did not know the exact terms and conditions of the various notes evidencing loans to the bank by the Reconstruction Finance Corporation. However, the truth is that had they been given the exact terms of such notes it would have only emphasized the truth of what they had been told. No fraud of any kind is charged or claimed. We are unable to dis-

cover any evidence of mutual mistake of material facts sufficient to form a basis either in law or equity to sustain the judgment of the trial court.

We had a very similar situation in Leach v. City-Commercial Savings Bank, 207 Iowa 1254, 219 N. W. 496, wherein the court said [page 1268 of 207 Iowa, page 502 of 219 N. W.]:

"While this equity appeals very strongly to us, at the same time, if it is to be sustained, some principle of law or equity must be discovered on which it can rest." The only "principle of law or equity" on which appellees claim to rest their action is the "right to recovery of money mistakenly paid." Appellees also contend that the Leach case is not controlling; whereas, appellant relies almost entirely upon the Leach case for reversal. We are of the opinion that, when the facts are properly interpreted and the law rightly applied, the Leach case is controlling. Briefly stated, the facts in the Leach case are these:

The notes of thirteen depositor-borrowers of the City Commercial Savings Bank at the time such bank was placed in receivership were held and rightly in the possession of the Federal Reserve Bank. Upon demand these claimants paid the said notes under protest directly to the agent of the Federal Reserve Bank. Thereafter a settlement of the indebtedness between the Federal Reserve Bank and the receiver of the insolvent bank was consummated by virtue of which collateral amounting to $214,000 came back into the hands of the receiver and thereafter the receiver quite properly permitted the right of set-off in favor of borrowers whose notes as yet had not been paid. The thirteen claimants, who had been compelled to pay prior to the aforesaid settlement, filed claims in the receivership claiming preference to the amount of their deposits on the theory that they were entitled to an equitable set-off. The trial court granted such relief and, on appeal by the receiver, this court reversed the case and from that opinion we quote the following:

"The status of the claimants to the receiver of the bank, at the time the receiver took charge, and ever since has been, and is, that the claimants, as depositors, have claims against the assets in the hands of the receiver for the amount representing their deposits, but the bank did not then, nor does it now, have any claim whatever against the claimants against which the deposits could be used as set-offs."

This is exactly the situation we find in the instant case. At no time was the receiver possessed of a claim against appellees against which the deposits could be used as set-offs. The terms and conditions under which the collateral was held were embodied in the notes themselves by virtue of which broad powers were conferred upon the Reconstruction Finance Corporation including the right to sell and dispose of the collateral without limitations or to enforce collection by suit in its name or otherwise. Its right to collect appellees' notes and foreclose the mortgage was just as absolute as that of owner so long as there remained anything due on the principal obligation. If and when appellees' notes became due, the obligation to pay the same to the Reconstruction Finance Corporation was absolute and unconditional. The Reconstruction Finance Corporation was the real party in interest and, hence, a proper party plaintiff and would have been entitled to maintain suit on these notes without previous demand for payment whenever they became due. Mid-West State Bank v. Struble, 203 Iowa 82, 212 N. W. 377. And, in such event, no right of set-off could have been sustained. The fact that appellees voluntarily paid their notes before maturity in no way changes or alters the legal aspect of the situation.

Was the money mistakenly paid? Would any less amount have satisfied the debt owing to the Reconstruction Finance Corporation on appellees' notes? Could appellees have tendered the amount paid less their deposits and with any legal force or effect insisted on satisfaction in full of their debt? The answer must be in the negative. But what about the equities in the case? Let us see. The payment was not induced by anything that was said by the receiver. No one had even asked for payment. It was voluntarily made before maturity. They had their own attorney; there was no over-reaching practiced. But, according to appellees, the receiver has, since May, 1937, been allowing set-offs to persons bearing the same relationship or status as appellees. There is no evidence that such was or is the case as to any person whose notes were paid prior to May, 1937. It is only as to notes unpaid and set-off, in such cases, was permissible only by virtue of express waiver by the Reconstruction Finance Corporation as heretofore pointed out. The equities were just as persuasive in the Leach case, yet we held they were not sufficient. It is true that, as this works out by actual mathematics, the balance of the equity that will remain to be returned to the receiver to be dis-

938

tributed among creditors· is enhanced in the exact amount of the appellees' deposit account. This was also true in the Leach case and is true in every case where notes are pledged as collateral. Those makers, who are forced to pay before the excess collateral is determined and returned, receive the worst of it.

■ Appellees, inferentially at least, concede that if the examiner in charge was acting as agent for the Reconstruction Finance Corporation in collecting appellees' notes, then the Leach case settles this law suit. Payment in the Leach case was direct to the agent of the pledgee, whereas, in the case at bar, payment was made to and through the examiner in charge. Appellees point out that the books lay down the rule "that generally speaking, a receiver is not an agent, except of the court appointing him; the very term receiver negatives such an idea." 23 R. C. L., p. 7. This is quite true. It is also true that the receiver is at least "a quasi-trustee holding the fund for the benefit of whoever may eventually establish title thereto." King v. Goodwin, 130 Ill. 102, 22 N. E. 533, 535, 17 Am. St. Rep. 277.

■ It is likewise true that the "title to property is not changed by the appointment of a receiver." Bell v. American Protective League, 163 Mass. 558, 40 N. E. 857, 28 L. R. A. 452, 47 Am. St. Rep. 481. "A receiver takes the property subject to existing liens and equities and his exclusive possession thereof does not interfere with, or disturb, any pre-existing liens, preferences, or priorities, * * * " See Note, 71 Am. St. Rep. 353.

■ Now let us see how the matter was handled in the instant case. It appears that the appellees obtained their loan with which to pay off their notes from the Equitable Life Insurance Company and this matter was handled through the Davenport Bank and Trust Company, another banking corporation situated in Davenport, Iowa. The mechanics by which payment of appellees' notes was accomplished being as follows:

The receiver was notified either by Compton or the Davenport Bank and Trust Company that the money was ready. Thereupon, the receiver wired the Reconstruction Finance Corporation at Chicago to "ship today G. W. and A. M. Compton mortgage notes with all supporting papers." In response to this telegram the Reconstruction Finance Corporation through its fiscal agent, Federal Reserve Bank of Chicago, shipped to Bert McCulloch, examiner in charge of the Union Savings Bank and Trust Company of Davenport, Iowa, by registered mail, the two

Compton notes and mortgage, assignment of the mortgage, certificate of title, receipt for insurance policies, trust receipt for abstract, by what is designated as a "shipping ticket" upon which was listed all enclosures and at the bottom of this shipping ticket is the statement: "Sent to you in trust for collection and remittance to us". This shipping ticket (Receiver's Ex. I.) was in duplicate, one of which the receiver signed and returned to the Federal Reserve Bank of Chicago, Ill., which bank was the fiscal agent for the Reconstruction Finance Corporation and custodian of all collateral held for the account of the Reconstruction Finance Corporation. After the receiver or examiner in charge was in possession of these notes and mortgage and other supporting papers, the principal amount due on the two notes was paid to the receiver by the Davenport Bank and Trust Company and the interest was paid personally by Mr. Compton. The two notes were stamped paid by the receiver, using the ordinary "paid" stamp of the bank. A release of mortgage, executed by D. W. Bates, Superintendent of Banking of the State of Iowa, together with the cancelled notes and mortgage were delivered by the receiver to the Davenport Bank and Trust Company.

It is appellees' contention that this constituted a redemption by the receiver of these two Compton notes and that at the time they were paid they constituted assets of the insolvent bank. In support of this contention, the method of bookkeeping used by the receiver was shown from which it appears that the indebtedness due the Reconstruction Finance Corporation was carried on the receiver's books and it was classified by the receiver as secured creditor of the bank. The notes, up for collateral, were listed as being up as collateral with the Reconstruction Finance Corporation. The receiver testified that he continued to collect the amounts due on the various instruments pledged as obligations due to the Reconstruction Finance Corporation and that, when any money was collected, he entered it on the books as a credit upon the indebtedness due to the Reconstruction Finance Corporation; that he was required to account to the Reconstruction Finance Corporation for the full proceeds of all collections made unless there was an express waiver. On his books he would credit cash and change bills payable. The receiver testified that he was interested in preserving whatever equity there might be in this collateral.

We are unable to see how the method of bookkeeping could

in any way change the legal rights of the Reconstruction Finance Corporation. We quote from the testimony of the examiner in charge:

"We had no assets to start this receivership out with except a stockholders' liability. Our only interest in the pledged assets was in realizing for the receiver on the equity in those assets. Immediately after opening the receivership I went to Chicago to the Reconstruction Finance Corporation to work out a plan of procedure for handling the matter and the arrangement we made was that I was to come back home and operate the receivership the same as any other closed bank and account to the Reconstruction Finance Corporation for all the collateral. If there were to be any concessions or promises made, I must secure their approval. In substance that was about what the plan was. When anybody wanted to pay off any obligation they owed the bank that had been pledged, I would send to the Reconstruction Finance Corporation for the paper involved and they would send it to me under a trust receipt similar to Receiver's Ex. I. and I collected on that paper from the debtor, I would immediately remit the amount thereof to the Reconstruction Finance Corporation. I would credit cash and charge bills payable. We take all our collections that we make during the day and purchase a draft for the exact amount and send it together with the daily report to the Reconstruction Finance Corporation."

When appellees' notes were sent to the examiner in charge under the express reservation and condition contained in the shipping ticket, that they were sent for collection and remittance to the pledgee and so accepted by said examiner, said notes did not thereby become assets of the bank; this did not amount to a redemption of the collateral; the rights of the pledgee therein and to the proceeds were not changed. Said notes and proceeds were held in trust by the examiner for the pledgee and in legal effect this amounted to a payment of the notes direct to the Reconstruction Finance Corporation; and no rights of set-off existed as against the Reconstruction Finance Corporation. This being true, the rule announced in the Leach case is applicable.

It, therefore, follows that the able trial court was in error in ordering a refund and the case is accordingly reversed

and remanded for judgment and decree in harmony with this opinion.—Reversed and remanded with instructions.

Chief Justice and all Justices concur.