## CLEVELAND NAT. BANK v. KENT.

### No. 7859.

Circuit Court of Appeals, Sixth Circuit.

Nov. 16, 1938.

Frank Spurlock, of Chattanooga, Tenn. (Frank Spurlock and Brown & Spurlock, all of Chattanooga, Tenn., and Charles S. Mayfield, of Cleveland, Tenn., on the brief), for appellant.

Estes Kefauver, of Chattanooga, Tenn. (J. B. Sizer and Sizer, Chambliss & Kefauver, all of Chattanooga, Tenn., on the brief), for appellee.

Before HICKS, SIMONS and HAMILTON, Circuit Judges.

HICKS, Circuit Judge.

The Chattanooga National Bank (herein called Chattanooga) was declared insolvent, and appellee, Paul Kent, its Receiver, brought suit at law against appellant, Cleveland National Bank (herein called Cleveland) for $69,627.65, the aggregate amount of certain notes which the declaration alleges were endorsed and discounted by Cleveland to Chattanooga before the receivership.

The declaration further alleges that Chattanooga, prior to its closing, had sent these notes to Cleveland for collection and that Cleveland had failed either to account for them or to return them.

Cleveland pleaded—(1) that it did not owe for or on account of the notes; (2) that it had not discounted them with Chattanooga; (3) that Chattanooga had not sent them to it for collection, and (4) set-off.

Without objection the action proceeded as in equity. The court denied the set-off except for an item not here involved and entered a decree against Cleveland for the full amount of the notes less the set-off allowed. Cleveland appealed.

We think that the plea of set-off against the claim of the receiver of an insolvent bank (the only issue involved here) is equitable in its nature (North Chicago Rolling-Mill Co. v. Ore & Steel Co., 152 U.S. 596, 616, 14 S.Ct. 710, 38 L.Ed. 565), that the procedure in the District Court, acquiesced in, may not now be questioned; and we proceed to a review of the case as an appeal in equity. Title 28, Sec. 398, U.S. C., 28 U.S.C.A. § 398; Burlew v. Fidelity & Casualty Co., 6 Cir., 64 F.2d 976, 978.

For many years the First National Bank of Chattanooga was the correspondent of Cleveland. Each of these banks carried an account on the books of the other. The First National ceased to do business on December 31, 1932, and Chattanooga opened on January 3, 1933, with many of the officers of the First National, taking over its commercial banking business and writing Cleveland asking that its business be continued with it (Chattanooga) on the same basis. Harle, Cashier of Cleveland, and connected with it for 45 years, testified that, "it received and relied upon this letter and did continue to do business with the Chattanooga National Bank in exactly the same form and manner as previously." He summarized the twenty-five year arrangement with Chattanooga's predecessor as follows: "* * * when our balance would run low and we needed money to keep up our balance we would pick out a batch of notes and I would usually take them down and tell * * * the officers I wanted some money, endorse the notes and they would put them to our credit less the discount. As they came due they were charged back to our account prior to their maturity without endorsement and we credited them on the day they were due to the Chattanooga National Bank and they charged us."

It does not appear that Cleveland in forwarding these notes to the Chattanooga banks ever signed any independent promise to pay. Its endorsement of the notes of its customers in blank was all the writing offered or required.

It was the custom of Chattanooga and its predecessor, First National, to return these notes to Cleveland a short time before

they matured, using a form describing them and containing the line: "We enclose for collection and credit or remittance when actually paid." The Chattanooga banks did not endorse the notes or give notice to the makers. At their due date Cleveland was charged with the amount of the notes on its deposit account with the First National, when these banks were doing business together, and later on its account with Chattanooga, and Cleveland credited the Chattanooga banks on its own books.

This method of handling the notes worked satisfactorily since Cleveland never allowed its account to be overdrawn, always building it up in anticipation of the notes to be returned just prior to their maturity, and to be charged to it at maturity. There was no instance wherein Cleveland collected one of the notes and then forwarded the proceeds to either Chattanooga bank. Higgins, Vice-President of the First National for twenty-five years, who held the same position with Chattanooga until it closed, testified that the Chattanooga banks always got credit for the notes returned and did not know or care whether the makers paid them. He said, that Chattanooga did not know the rate of interest the makers were paying and never asked or cared; that the Chattanooga banks never demanded payment of the makers and did not know whether the makers ever knew that the notes were transferred. He further testified:

"Q. And did not care; you were not concerned with it? A. What we wanted was our money.

"Q. And you got it by being credited on the Cleveland Bank account? A. Yes."

This was the well established procedure for handling such notes which Chattanooga asked to, and did, continue; and to which Cleveland gave full acquiescence.

Chattanooga operated for slightly less than two months. It closed on March 1, 1933, except for certain limited transactions. Of the eighteen notes forwarded to Chattanooga by Cleveland under the circumstances involved, and here sued on, none matured before March 1, the earliest maturity date being March 3 and the last March 28. However, following the practice above outlined, at least seven of them aggregating $37,260 and maturing between March 3 and March 9 inclusive were returned to Cleveland prior to March 1. Higgins testified that seven were returned on February 20 and the others on March 17 which was after the appointment of a Conservator for Chattanooga. Harle indicated that all were returned prior to March 1. We do not deem the exact dates material.

Cleveland, on March 3, gave Chattanooga credit for three notes aggregating $19,560 and maturing, respectively, two on March 3 and one on March 5; on March 13 for four notes aggregating $17,700 and maturing, one each on March 7 and 8; and two on March 9; and on March 18 for four notes aggregating $12,600 maturing, one each on March 12 and 16 and two on March 17. These three credits totalled $49,860, leaving a balance of $10,200 on the remaining seven notes, upon which Cleveland made no offer of credit, after receiving a letter from the Conservator dated March 18, citing a ruling of the Comptroller forbidding further charging of notes to Cleveland on the books of Chattanooga. At first the amount of $49,860 was charged by Chattanooga to Cleveland against the credit or deposit balance standing in its favor on Chattanooga's books. But soon after March 18 the Comptroller made another ruling to which he adhered, denying the right of Cleveland to offset *any* of the notes sent to it.

On October 29, 1935, Chattanooga demanded the return of all the notes or the proceeds thereof and upon Cleveland's failure to comply, the suit was instituted.

It is appellee's position that when Cleveland sent the notes to Chattanooga, endorsed in blank, Chattanooga became the owner and that when they were returned to Cleveland for collection the latter held them in trust; and that since the collection was not made before Chattanooga closed on March 1, the receiver was entitled to the notes or their proceeds.

Cleveland insists that by its long standing custom and agreement with the First National Bank, acquiesced in and continued by Chattanooga, its endorsement of the notes was indicative only of an independent promise to pay, if for any reason its deposit account with Chattanooga became insufficient; that the notes went to Chattanooga as collateral to that promise and when Chattanooga returned them and charged them to its deposit account at maturity it was getting back its own property; and its deposit balance with Chattanooga should be offset against appellee's demand.

The court adopted appellee's view, holding that the rights of the parties were

fixed on March 1; that the transactions did not create an obligation by way of oral promise on the part of Cleveland and that the return of the notes constituted but a convenient method of collecting them. It concluded that the failure of Cleveland to show insolvency of the makers of the notes defeated the right of set-off.

We take the contrary view.

It is true that the endorsements of the notes by Cleveland would indicate that Chattanooga· became the owner and the line quoted from the ticket sent to Cleveland with the notes would indicate that the parties regarded the notes as the property of Chattanooga; but there is something more than this in the record and the evidence must be considered in the aggregate:

The ticket was the form generally used by Chattanooga and its predecessor in forwarding items for collection. But the undisputed fact is that both banks understood that the notes in so far as Cleveland was obligated to Chattanooga were to be paid and had been paid to Chattanooga out of Cleveland's deposit and that Chattanooga had no intention of collecting them from the makers for its benefit. Both understood that Cleveland's endorsement was to be satisfied by Chattanooga's charging the notes to Cleveland's deposit with it. This was one of the principal reasons that impelled Cleveland always to maintain a sufficient deposit with Chattanooga. This agreement had been lived up to by Cleveland and the First National for twenty-five years and by Chattanooga during its short existence. Both parties had implicit confidence in each other and the agreement was not arrived at in anticipation of insolvency. Appellee should be required to honor it.

In Scott v. Armstrong, 146 U.S. 499, 13 S.Ct. 148, 36 L.Ed. 1059, the court said [page 151]: " . . . . . but liens, equities, or rights arising by *express agreement, or implied from the nature of the dealings between the parties,* or by operation of law, prior to insolvency and not in contemplation thereof, are not invalidated." (Italics ours.)

Equity will impute to Chattanooga an intention to fulfill its obligation and will require its receiver to do that which in good conscience should have been done; and the only way whereby the court can determine what should have been done is to follow the maxim that "equity looks to the intent rather than to the form."

The decree is reversed and the case remanded with directions to enter a decree in accordance with this opinion.